ELIZABETH A. THOMPSON *vs.* UNITED LABORATORIES COMPANY.

WILLIAM H. THOMPSON *vs.* SAME.

Suffolk.    March 16, 1915. — May 21, 1915.

Present: RUGG, C. J., LORING, BRALEY, PIERCE, & CARROLL, JJ.

*Negligence,* Dangerous occupation, Employer's liability.

In an action against a corporation called a laboratories company, manufacturing among other things antiseptic powders and rat poison, for illness and suffering alleged to have been caused by being poisoned when the plaintiff was seventeen years of age and was employed in the defendant's factory, there was evidence that the plaintiff, after working about four months in the defendant's dry filling department, was transferred to the rat poison filling department in the basement, where there was very little ventilation and where the plaintiff's duty was to put the rat poison into cans, that the rat poison contained about twenty per cent of arsenic and was so volatile that a palpable visible dust, which easily was inhaled, filled the confined space in which the plaintiff worked and settled upon her hair and clothing, that the defendant put labels on the cans in

which the rat poison was stored calling it deadly poison, that no warning was given to the plaintiff, that the forewoman under whom the plaintiff worked assured her that the rat poison was "like the other insect powders" and that, when the plaintiff suffered from symptoms of arsenical poisoning and complained to the forewoman, she was told by her that these symptoms were caused by a cold in the head and not by the rat poison.   There was evidence that the defendant knew that the plaintiff and a girl who worked with her had become more or less ill as often as they worked in contact with the rat poison and that they had revived when relieved from so working.   *Held,* that there was evidence for the jury on which they could find that the plaintiff failed to understand the danger to which she was exposed, and that, although the conditions were known, the danger involved was not obvious and the plaintiff did not assume the risk of the injury she suffered.

In the case above stated, it also was *held,* that it could be found that the defendant was negligent in failing to warn the plaintiff that she might be poisoned by inhaling the dust from the volatile mixture she was told to put into cans, and that the jury could find that the defendant should have foreseen that injury in some form at some time probably would occur to some one engaged in what might be found to have been a business dangerous to the persons employed.

PIERCE, J.   These two cases were tried together; one brought by the minor plaintiff, who sued for personal injuries received by her while in the employ of the defendant, and the other for loss of services and expenses.   They are considered together, as the right of the father is dependent upon the right of his daughter.   *Regan v. Superb Theatre, Inc.* 220 Mass. 259, 261.   The only exceptions taken at the trial were to the refusal of the presiding judge * to direct a verdict for the defendant.   Hence the only question presented to this court is whether in any aspect of the evidence the jury were warranted in finding the defendant guilty and the minor plaintiff not guilty of negligence which caused the injury complained of.

The jury were warranted in finding that the minor plaintiff, who was born on August 29, 1894, entered the employ of the defendant in its dry filling department in March, 1911; that after she had worked in this department from March, 1911, until July 17, 1911, on the last named day she was transferred to the rat poison filling department in the basement; that this department occupied spaces cleared temporarily among the packing cases which reached almost to the ceiling; that the windows there were high up and were nailed so that they could not be opened, and that the only ventilation was

---

* *King,* J.

from a door some fifty feet away, which was not always open; that the rat poison contained nineteen and five hundredths per cent of arsenic; that as used it gave off a dust at times sufficient to cause the girls' hair to appear white and sometimes they wore paper caps to keep it out of their hair; that it was volatile and might be inhaled easily under the conditions existing in this department. During the months of July, September, October and December, 1911, the plaintiff worked at intervals nearly five full days in this last named department. The work consisted in placing the loose arsenical powder in two ounce cans, and from two thousand to four thousand cans were filled each day, "enough arsenic, if taken internally, to make a fatal dose for over eighty thousand people." When directed to work on rat poison she "inquired whether it was poisonous or not and was told by the forelady, 'No; it was like the other insect powders' (which, from the defendant's formulas, contained no ingredients that would be poisonous)."

The plaintiff testified that no other warning was given her, and no testimony appears in the record to the effect that this statement was not true. One Hadley, the superintendent of the defendant's factory, testified "that he knew, before the plaintiff was put to work on rat poison, that it contained a considerable percentage of arsenic, which he knew was poisonous; that he prepared a label calling it deadly poison; that he frequently saw the girls working on the poison in the basement; that it never occurred to him that it might be inhaled, or that minors might be ignorant of the possible results that might follow from inhaling it; that he himself gave, or caused to be given, no warnings to any employees about how the same should be handled to avoid injury to themselves; that he simply told the foreman of the department to 'inform them to be a little careful;' that no special instructions were given about warning young girls; that he considered it the duty of the foreman to do this himself, and not to delegate it to the forelady; that respirators were furnished men who worked on mixing antiseptic and non-poisonous powders, but none was given to the sixteen to seventeen year old girls who were put to work on rat poison; that no fans or suction blasts that might draw off the poisonous dust were furnished because he 'didn't think they were necessary;' that the only chance that there would be that plaintiff would be warned was through the foreman; that no notices, except as afore-

said, were posted or given the employees; that he later told plaintiff's father that she couldn't have been poisoned in the dry filling department." The foreman, Hilton, testified that "he knew arsenic was poisonous; that the work [of] filling the cans with rat poison was rather dusty;" and "that he never warned Miss Thompson [the minor, plaintiff] personally, as to any danger that might arise from working on rat poison." William H. Warren, a witness for the plaintiff, testified "that he had been educated at Harvard and Heidelberg Universities; that he had received the degree of Ph.D. from Harvard University in chemistry; that he had served as managing chemist for some years in a large wholesale and manufacturing chemical house in New York, that he had been professor of chemistry in Washington University, and now held a similar chair in Wheaton College; that he had specialized in poisons; that he had made tests of the mixture in question in this case and found that it was volatile and might be inhaled easily under the circumstances described as those under which plaintiff worked;" and "that from his experience he considered the conditions described as those under which she worked were unsafe."

From the plaintiff's testimony it appeared that the day after she was set at work in the rat poison department she, with another girl who worked with her, "suffered from nose bleed, smarting eyelids, and thirst; that she laid these to her work on rat poison of the day before and told the forelady, who told her that all she had was a cold in the head, and convinced her that she was wrong; that the same symptoms reappeared when she worked on the rat poison later on, but would disappear as soon as she stopped," and that in December "they became worse." Later, on March 17, 1912, and until the fourth day of May following, she was laid up at home suffering from a rash and boils.

There was testimony from her medical witness, as also from those of the defendant, that her symptoms were consistent with arsenical poisoning from arsenic contained in the rat poison in which she had worked.

The defendant's contention was that "All the conditions surrounding the plaintiff's employment including the places where she did her work, the materials and implements with which she did her work, and the method or manner of doing her work, were the same throughout her entire employment by the defendant."

The defendant argues in effect that the plaintiff assumed the risk incident to the handling of a compound nearly twenty per cent of which was arsenic, so free, so volatile, that a palpable, visible dust filled the confined space in which she worked and settled upon her hair and clothing. These conditions she knew, but she did not understand, nor, without experience and a scientific knowledge which there is no evidence that she possessed, could she be aware of the hazards to which these conditions exposed her. While the conditions were known, the danger incident thereto was not obvious. Risks which are obvious only to those possessing scientific knowledge are not assumed. *Cox* v. *American Agricultural Chemical Co.* 24 R. I. 503. *Neal* v. *Phoenix Lumber Co.* 64 Wash. 523. Moreover she was told when set to work by the forewoman, whom she was bound to obey, that the powder was not poisonous. To some extent at least she had the right to rely on that statement. *O'Brien* v. *Nute-Hallett Co.* 177 Mass. 422. And the jury, in passing upon the question of her due care and assumption of the unusual risks incident to obvious conditions, had the right to take such an assurance of safety into consideration.

The defendant further contends that upon all the evidence it cannot be asserted as matter of law that the plaintiff could or would be poisoned by the inhalation of dust containing arsenic, and therefore that it is not bound to foresee results of which common experience would not warn it and which only a specialist would apprehend. See *Hubbell* v. *Yonkers,* 104 N. Y. 434. This contention finds no support in the law as applied to the facts of this case. As a matter of fact it knew that the compound contained a large percentage of arsenic; it knew that it was poisonous; it put a label upon the cans in which it was stored, calling the attention of those into whose hands the preparation might come to the fact that the contents of the container were a deadly poison. It knew that the plaintiff and a girl who worked with her became more or less ill as often as they worked in contact with the preparation and revived when relieved from so working. Surely these facts are not consistent with excusable ignorance of the danger to the health and life of infant employees lurking in circumambient poisonous dust.

As matter of law a master engaged in a business inherently dangerous to the life and health of employees is bound "to become

informed of those matters of scientific knowledge possessed by men of general education and information relative to the danger and hazard of the business in which he is engaged." *Hysell* v. *Swift & Co.* 78 Mo. App. 39, 49. *Latorre* v. *Central Stamping Co.* 9 App. Div. (N. Y.) 145. It is clear from the testimony of Professor Warren that an investigation would have disclosed the fact that the mixture was volatile, might be inhaled easily under the conditions obtaining in the defendant's place of business, and so handled was unsafe.

The defendant, admitting that a warning was not given, insists that a warning would have been of no avail because the plaintiff had no way of knowing that the inhalations might poison her, and because the purpose of a warning is to enable the employee to work in safety. But a warning of an unknown and unexpected danger affords also an opportunity to the employee to determine whether the contract of employment shall be enlarged to include what is to him a new situation, or whether it shall be abandoned. Considering the nature of a contract of employment, and in connection therewith the frequent hardship of the application of the doctrine of the assumption of the risk, it would seem that the later consideration is the basic reason for requiring a warning. It is not necessary that the person to be harmed or the form which the injury shall assume should have been foreseen. "It is enough that it now appears to have been a natural and probable consequence." *Hill* v. *Winsor*, 118 Mass. 251. *Ogden* v. *Aspinwall*, 220 Mass. 100.

In the case at bar the jury properly could find that the defendant should have foreseen that injury in some form, at some time, probably would occur to some one of the persons engaged in what might be found to be to them a most dangerous business.

No error appears in the submission of the cases to the jury.

*Exceptions overruled.*

*E. C. Stone*, for the defendant.
*J. F. Neal*, for the plaintiffs.