## WILLIAM J. LOWRIE *vs.* JAMES B. CASTLE & another.

Suffolk.   March 30, 31, 1916. — June 20, 1916.

Present: RUGG, C. J., LORING, BRALEY, DE COURCY, & PIERCE, JJ.

*Practice, Civil,* Amendment, Conduct of trial. *Pleading, Civil,* Declaration. *Judgment. Deceit. Damages,* In tort.

At the trial of an action at law it is within the discretionary power of a presiding judge, who previously has allowed the plaintiff to amend a certain count of his declaration, to permit him further to amend the count by striking out all that he has been allowed to add to it.

It also is within the discretionary power of such presiding judge, after having allowed the amendment above described, to permit the defendant to demur to the declaration, which contains counts both in contract and tort, on the ground of misjoinder of counts in that the count amended as above described, which is in tort for deceit, sets forth a different cause of action from other counts of the declaration which allege a breach of contract.

In the case above referred to the counts in contract alleged the employment of the plaintiff by the defendant as the manager of a sugar plantation at the salary of $12,000 a year and his wrongful discharge by the defendant, and the count in tort for deceit alleged false and fraudulent representations of the defendant which induced the plaintiff to resign as the manager of the plantation in question. The presiding judge sustained the demurrer. *Held,* that the counts were misjoined in law and that the demurrer was sustained rightly.

In the same case it was *held,* that the plaintiff, after the order sustaining the demurrer, properly was allowed five days within which to elect whether to proceed on his counts in contract or on the count in tort.

In the same case it appeared that the count in tort originally had been added to the declaration by a previous amendment which had been allowed by another judge, and it was argued for the plaintiff that the order allowing this amendment was an adjudication that the count in tort was for the same cause of action as the counts in contract. *Held,* that the order allowing the amendment was only a decision under R. L. c. 173, § 121, that the count in tort was for the cause of action for which the action was intended to be brought, and that the question whether the declaration as amended was demurrable for misjoinder of counts was a different one and was left open.

In an action of tort for false and fraudulent representations made to the plaintiff that he had been discharged as the manager of a corporation operating a certain sugar plantation and that his successor had been appointed, whereby he was induced to resign as such manager, it appeared that the salary, which by the defendant's agreement the plaintiff had received as manager, was $12,000 a year and that he continued to receive payment at the same rate for three months and a half after his resignation, that before the expiration of this time he was employed as the manager of another sugar plantation under a contract for ten years at a salary of $15,000 a year with a further interest in profits and a privilege of buying stock, that at the time he was employed as manager by the defendant he was given the right of purchasing five thousand shares of the corporation for which he was engaged as manager, and that he exercised this right, pledging these shares with shares of another stock as security for a loan of $150,000, which was payable two years and ten months after his resignation, that in the month following that in which he resigned the plaintiff sold the five thousand shares of the corporation at the market price, receiving for the shares $150,773 which he applied in payment of his note for $150,000, that at the time the deception was practiced upon the plaintiff he had outside property from which he received an annual income of about $13,000, that he resigned in January and obtained his new position with the increased salary in the following May, that in the following September the market price of the stock of the corporation of which the plaintiff had been manager was considerably lower than it was when he sold his five thousand shares in the preceding February, and that the market price of the stock was not materially higher until more than two years after the deceit complained of. The plaintiff claimed no damages for loss of salary but claimed damages for his loss sustained in being compelled by reason of his resignation to part with his five thousand shares in the corporation. *Held,* that, even assuming that the plaintiff had been compelled to part with his shares, which did not seem to be proved, he might, when he soon became better off, have bought them back again at the same price or cheaper, and that his failure to make a profit by selling the shares at a high price more than two

years after the deception was due to his own action or want of action and not to the tort of the defendant, so that the plaintiff was entitled to recover only nominal damages.

In the same case the plaintiff contended that he was entitled to damages for the loss of gains and profits which he would have made, if he had remained the manager of the corporation, by building up the sugar plantation from a small to a large production and thus making more valuable the five thousand shares of stock that he then held and the stipulated privileges given him by his contract as manager. It appeared that the tenure by the plaintiff of his position as manager was uncertain and that his employment could have been terminated at any time at the pleasure of the directors of the corporation. In view of this fact among others, it was *held*, that such damages were speculative and hypothetical and could not be recovered.

RUGG, C. J.   There were three counts in the declaration as originally filed, all in contract. The writ stated the cause of action to be in contract. Subsequently the plaintiff was allowed to amend by substituting a new third count and by adding a fourth count (later eliminated by the sustaining of a demurrer thereto without exception or appeal), and a fifth count in contract, and by inserting in the writ after the words "in an action of contract," the words "or tort, all counts being for one and the same cause of action." Still later counts six and seven in tort for fraud and deceit were added against the objection of the defendants. The case then was sent to an auditor,* before whom protracted hearings were had, who found that the plaintiff failed to establish any of the counts in contract and that the conversations relied on to support them did not reach a meeting of the minds and were preliminary to a contract in writing set forth in the report. After the auditor's report came in the plaintiff moved to amend in several particulars his seventh count, upon which the auditor's findings in the plaintiff's favor were based, a part of which was denied and the rest allowed, with leave to the defendants to demur or answer within a specified time. Later the plaintiff on motion was permitted † further to amend count seven by striking out so much as had been added by the last amendment so far as it had been allowed. This was all within the court's discretion, which does not appear to have been abused and which cannot be revised. *Barlow* v. *Nelson*, 157 Mass. 395. *First National Bank of Chelsea* v. *Hall*, 170 Mass. 526. *Fay* v. *Boston & Worcester Street Railway*, 196 Mass. 329, 336.

* Hon. Francis W. Hurd.                     † By *Wait*, J.

The defendants then, but within the time limited by the court, filed a demurrer, the only present material part of which was directed to an alleged misjoinder of count seven with the counts in contract. The demurrer was allowed to be filed and was considered. This was within the discretion of the court. Each change in the count was brought about by an amendment and the defendants could plead thereto. Even though the original form of count seven was restored by the final amendment, it was within the power of the court to permit the filing of a demurrer, on the ground that there was a misjoinder of counts, when count seven was added. Superior Court Rules, 5, 10. *Whitney* v. *Hunt-Spiller Manuf. Corp.* 218 Mass. 318. Although it is unusual to permit a demurrer to be filed under the circumstances here disclosed, it cannot be said to have been unwarranted. There had been a long trial before an experienced and able auditor, whose findings against the plaintiff on the counts in contract bore strong inherent evidence of being sound. If counts were misjoined in law, the discretion of the court in allowing a demurrer on this ground was not abused.

The demurrer rightly was sustained * on the ground of misjoinder of counts. The statute prohibits the joinder of actions of contract and tort, although counts in each may be joined when it is doubtful to which division they belong, with an averment that both or all are for the same cause of action. R. L. c. 173, § 6, cl. 6. The causes of action set out in the contract counts plainly sound in contract. They aver an engagement of the plaintiff as the manager of a sugar plantation for periods of time there described by the persons named and a discharge contrary to the terms of the contract. The counts in tort equally clearly set out a cause of action sounding in deceit and aver that certain named persons by misrepresentations induced the plaintiff to resign his position. The groups of persons alleged to be concerned are not identical with those named in the contract counts. A breach of contract to continue the employment of a person is a different thing from fraudulently inducing him to resign by making false representations to him. If there was a breach of contract in discharging the plaintiff, there was no deceit in communicating that information to him. If he was fraudulently induced to resign his office with

---

* By *Wait*, J.

the corporation, it is difficult to see a breach of contract. The full trial before the auditor, with a thorough and comprehensive report by him covering the whole field, had given ample information to the plaintiff as to the ground upon which he ought to be prepared to rely.

The allowance of five days to the plaintiff within which to elect whether to proceed on the contract counts or on the tort counts, or further to amend, was not error. Of course he might have elected also to rely on his strict rights and needed no permission to do that.

The circumstance that the tort counts had been added by an amendment allowed by another judge * was not an adjudication upon the question of misjoinder of counts in contract and tort. The only question passed upon in allowing the amendment was whether the new counts were for the cause of action for which the action was intended to be brought. R. L. c. 173, § 121. *Herlihy v. Little,* 200 Mass. 284. Whether the declaration as amended is demurrable is a different question. The decision of the Superior Court judge who allowed the amendment, although binding as to the point before him, *Tracy v. Boston & Northern Street Railway,* 204 Mass. 13, 16, 17, was not conclusive as to the matter raised by the demurrer.

The case was tried to a jury on the counts in deceit.† The auditor's report in the plaintiff's favor on count seven of his declaration was in evidence. The plaintiff testified at length and there were depositions and other evidence.

The pertinent facts on the merits may be summarized as follows: James B. Castle, on September 2, 1898, made an agreement to purchase fifty-one thousand shares of stock, which was a controlling interest, in the Hawaiian Commercial and Sugar Company, a corporation owning the largest sugar plantation in the Hawaiian Islands. A few days later, at his solicitation, the plaintiff gave to him an option on his services as manager of this plantation at an annual salary of $12,000. This option was in the form of a proposition addressed by James B. Castle to the plaintiff

---

* *Gaskill,* J.

† Before *Fox,* J., who ordered the jury to return a verdict for the plaintiff in the sum of $1, and reported the case for determination by this court under a stipulation stated later in the opinion.

and by him accepted. One paragraph was in these terms: "2nd. You to have the privilege of buying of the S. N. Castle Estate or of myself, at any time within three years from October 1, 1898, five thousand shares of H. C. & S. stock at cost, to include interest at 6% per annum, it being understood that, in case of such purchase, you will dispose of other securities to pay for these as rapidly as you may be able to do so upon terms perfectly satisfactory to yourself." James B. Castle carried out the agreement for the purchase of the controlling interest in the stock and caused the plaintiff to be employed as manager of the corporation. No term of service for the plaintiff as manager was stated in this written contract. The plaintiff sought to have it made a stipulation in the contract that, if the Castle family lost control of the corporation, he should have a contract for five years as manager, but James B. Castle did not agree and the plaintiff waived it. The controlling interest in the stock represented by this purchase of fifty-one thousand shares was divided in unequal parts between James B. Castle, W. R. Castle, and the S. N. Castle Estate (a corporation formed to manage a part of the estate of the father of James B. Castle, the stock in which was held by him and others of his father's family), Henry P. Baldwin and Samuel T. Alexander, the two latter being the leading members of the firm of Alexander and Baldwin, agents for sugar plantations with offices in Honolulu and San Francisco. These persons made an agreement to pool their interests in the stock until it was paid for in full and thereafter not to sell without first offering it to other members of the pool at the same price for which a *bona fide* outside offer had been made. The plaintiff exercised his option to buy five thousand shares of the stock from the S. N. Castle Estate, binding himself at the same time not to sell except according to the terms of the pool agreement. All these arrangements were concluded before the end of 1898. The plantation was only partially developed. It was the design of the parties that the plaintiff, whose reputation was that of a highly successful manager of sugar estates, should develop this plantation to a much higher productivity and that thereby the stock of the corporation would become greatly enhanced in value.

The auditor's report tends to show that the plaintiff entered upon the performance of his duties as manager with vigor and skill and caused important and extensive improvements to be

made on the plantation by way of irrigation canals, railroads, the erection of new buildings and the installation of new machinery, the bringing of large additional areas of land under sugar cultivation and otherwise. Considerable sums of money were expended for these purposes. The five thousand shares which the plaintiff purchased were carried by James B. Castle according to their agreement of September, 1898, in the latter's name and were deposited with other securities as collateral for a loan to him of $500,000, which became payable in November, 1901. James B. Castle planned to have this loan divided at its maturity so that the plaintiff would assume and carry on his own account without the aid of Castle the share represented by so much of the purchase price of his stock as was unpaid. This design was consummated apparently without objection by the plaintiff and he became indebted to a San Francisco savings bank on a note for $150,000 and on an open account for $10,000 with Alexander and Baldwin. The note was payable November 17, 1904, and was secured by all his Hawaiian Commercial and Sugar Company stock and by four thousand shares of stock in Ewa Plantation Company, another sugar corporation. In this borrowing transaction the Hawaiian company stock was assumed to have a value of $30 per share and the Ewa stock of $22, an aggregate of $238,000, and it was agreed that, if the value of the stock in the market should be depressed below that figure, the principal of the note should become due at the option of the holder.

The auditor found that "From the autumn of 1901, up to January 15, 1902, . . . there was a combination and conspiracy for joint action by and between James B. Castle, Henry P. Baldwin, who died July 8, 1911, Samuel T. Alexander, who died in September, 1904, Joseph P. Cooke and Wallace M. Alexander to oust, and procure in some manner the discharge or resignation of the plaintiff from his position as manager of the plantation and put Mr. Baldwin in his place;" that Samuel T. Alexander on January 15, 1902, misrepresented to the plaintiff that "he [Alexander] had been sent down from San Francisco by the directors to notify him that he had been discharged and that Mr. Baldwin had been appointed his successor, and he was to turn the place over immediately to Mr. Baldwin and told him to send his resignation to the directors in San Francisco and

that Mr. Baldwin had sent this resolution up to San Francisco to the directors having him [Lowrie] discharged and himself appointed manager because he said Lowrie couldn't get the work and planting done. Mr. Alexander also told him that the directors had voted him $3,000 for three months' pay from February 1st;" that there never was any such action by the directors either officially or unofficially as thus was represented; that the plaintiff sent his resignation as manager to the corporation and "that the plaintiff was induced and did send his aforesaid resignation solely by reason of misrepresentations made to him on January 15, 1902, by Samuel T. Alexander acting as a member and agent of the combination and conspiracy . . . , of which combination and conspiracy James B. Castle continued to be a member and adviser, as appears from his letters dated January 24 and 31, 1902, until its object was accomplished, and I find that he is legally responsible for the acts and representations made January 15, 1902, by said Alexander inducing such resignation." The plaintiff was ignorant of the fact that the statements made to him on January 15, 1902, were misrepresentations, until 1907. James B. Castle foresaw and realized, at least in December, 1901, "the effect upon the plaintiff encumbered as he was with the $150,000 note, of being suddenly deprived of a $12,000 salary."

The auditor further found: "At the time the tort was committed, both the Ewa stock which was, and the Hawaiian Commercial which was not, paying dividends, were much depressed in market price, and both were pledged as security for the $150,000 note, and were in danger of falling to the quotations at which the bank might require payment of the note. These two investments then constituted the bulk of the plaintiff's property. I find as a natural and proximate consequence of the tort committed upon the plaintiff that his condition was so changed he suffered therefrom the loss of gains and profits which would have accrued to him if his condition had continued undisturbed. These prospective gains and profits were within the contemplation of J. B. Castle and the plaintiff, in September, 1898, when Mr. Castle offered the plaintiff the five thousand shares as the inducement constituting the superiority of his offer over that which the plaintiff had received from Waialua. The stock was not paying dividends in 1898 and the manifest mutual intention was that the

plaintiff should' realize the profits which would result from his retaining the stock until he had paid for it in the manner provided in J. B. Castle's letters of September 14 and 19, 1898."

The plaintiff surrendered his position as manager to Henry P. Baldwin on January 25, 1902, and the latter accepted it. In February, 1902, the plaintiff parted with his five thousand shares of stock by several different sales for sums aggregating $150,773, which was applied in payment of his note for $150,000 at the San Francisco Savings Union. It was conceded at the trial that he got the best price that could be obtained for the stock at the time it was sold. In May, 1902, he obtained a position as manager of a sugar plantation in Porto Rico at a considerable increase in salary over what he was receiving in Hawaii. He testified that his contract was for ten years at a yearly salary of $15,000, with a further interest in profits and a privilege of buying stock. At the trial he disclaimed any damages for loss of salary.

The plaintiff testified that he was advised by Henry P. Baldwin not to sell his stock in the Hawaiian company. After saying to S. T. Alexander in substance that he must be relieved of his indebtedness at the San Francisco Savings Union, Alexander advised the plaintiff to try to sell to the Castles, and a part of it was disposed of to some of them, but none to James B. Castle or to any of those whom the auditor found to have conspired to procure the resignation of the plaintiff as manager. At the time of the deception practiced upon him, the plaintiff had outside property from which he received an annual income of about $13,000. The stock of the Hawaiian company was listed in the San Francisco stock market, and a summary compiled from daily lists of its sales is in the record. From this it appears that it did not rise in its sale value in the market at all until some time in October, 1902, and that in September, 1902, it was considerably lower than when the plaintiff sold his stock in the preceding February. Its selling price was not very materially higher until well into 1904, more than two years after the deceit complained of. There has been no contention and manifestly there could be no ground for an argument that the plaintiff was deceived as to the real value of the Hawaiian company stock. He knew the plantation, its capacity for immediate product and its possibilities for ultimate development as a physical property better than anyone else could

know. It is not urged that any one could, or tried to, deceive him in this regard.

There was a large amount of evidence bearing upon the capacity of the plaintiff to deal with the labor situation, which changed materially in the Hawaiian Islands after his contract of September, 1898, with James B. Castle by reason of the annexation to the United States, and upon the reasons why those whom the auditor found to be conspirators desired to have the plaintiff discharged, and as to the continuous mutual distrust and dislike between the plaintiff and Henry P. Baldwin from a time antedating the agreement of September, 1898, between the plaintiff and James B. Castle. But, in our view of the governing principles of law, these matters are not of controlling significance in this connection and they need not be narrated.

The substance of the plaintiff's claim is, as was stated by his counsel at the trial, "We are complaining that they (the defendants) waited until a certain time, and then they came down on him after a secret correspondence, maliciously, and by false representations put him in a position where they knew he would have to sacrifice the stock, and where, in consequence of what they did at that time, he did part with the stock to his loss, we claim; that is our case."

A verdict for the plaintiff in the sum of $1 was directed. The case is reported upon a stipulation by the parties that if upon the competent evidence the jury would not have been authorized to find a verdict against either defendant for more than nominal damages, then judgment is to be entered on the verdict.

The primary question presented is the correct rule of damages arising from the deceit in which the defendants are alleged to have participated or for which they are alleged to have been responsible. That deceit was the false statement to the plaintiff that, by vote of the directors of the Hawaiian Commercial and Sugar Company, the plaintiff had been deposed as manager, his salary to be continued for three months, and that Henry P. Baldwin had been appointed in his stead, although in truth no such vote had been passed, whereby the plaintiff was induced to resign as manager. The obvious resultant damage likely to ensue from such a fraud would be loss of salary. But as the plaintiff secured another and more permanent position with a substantial

increase of salary before the expiration of the time for which his salary was paid by the Hawaiian Commercial and Sugar Company, he suffered no loss in this respect and rightly at the trial disclaimed damages on this account. His claim is for the loss of profits which he would have made on his five thousand shares of stock if he had been left undisturbed in his position as manager.

The auditor found that the plaintiff's financial condition was such that when in January and February, 1902, he had lost his former position and had gained no other, "Reasonable prudence compelled some adjustment of his debts," chief among which was his note to the San Francisco Savings Union for $150,000. The fair inference from this finding and all the circumstances may be that the sale of all his Hawaiian Commercial and Sugar Company stock was brought about by this readjustment of his indebtedness. It is to be noted, however, that at that time he was possessed of considerable other property, from which flowed an annual income of $13,000. It would seem that the sale of the Hawaiian Commercial and Sugar Company stock was due to the fact that he did not regard it as so good an investment as some of his other stocks and properties. It is to be observed, also, that his original arrangement with James B. Castle was to "dispose of other securities to pay for these [the shares in Hawaiian Commercial and Sugar Company] as rapidly as you [the plaintiff] may be able to do so upon terms perfectly satisfactory to yourself." These words do not naturally import a selection among securities for purposes of investment, but a preference for the Hawaiian Commercial and Sugar Company stock above all others provided the others could fairly be sold. Moreover, his note at the bank would not fall due, unless the stock deposited as collateral for its security fell below the figure stipulated by the bank and the note then was called, for two years and nine months. But passing these considerations and assuming that the sale of the stock in January or February, 1902, was the direct result of the deceit practiced upon him, it still was the plaintiff's duty to do what was reasonable to recoup himself for the loss sustained. "The rule of damages in an action against a tortfeasor is that the plaintiff shall recover an amount commensurate with the wrong done him." *Nash* v. *Minnesota Title Ins. & Trust Co.* 163 Mass. 574, 581. It is the wrong following as the proximate result of the deceitful cause set in motion

by the tortfeasor for which damages may be recovered, and not for a wrong following from some other efficient cause. One who suffers a tortious wrong cannot remain absolutely supine when in a position to act for his own relief and claim as damages the consequences of his inaction. This is a general principle of the law of damages applicable alike to actions of tort and of contract. *Hall* v. *Paine,* 224 Mass. 62, and cases there collected.

Taking the plaintiff's statement of his claim at its face, that the defendants came "down on him . . . and by false representations put him in a position where they knew he would have to sacrifice the stock," he cannot recover damages accruing after he was in as good a position to buy and hold stock and carry it on borrowed money as he was at the time of their tortious conduct. Certainly, after the plaintiff secured his new position on a ten year contract at an increased salary, he was in as good a position to buy and hold Hawaiian Commercial and Sugar Company stock as he was before the deceit was practiced on him. For aught that appears, there was enough stock to be bought and the plaintiff's credit was as good as ever before. There is evidence in the record from his own testimony that he knew the market price of the stock for a considerable time at least. If he had desired to embark again in a speculation in that stock on borrowed money, there is nothing to indicate that he was not in as good position to do it as at the time the fraud was perpetrated on him. The wrong to the plaintiff was committed when his resignation was procured by misrepresentation. The consequences of that wrong may be assumed to have continued to be operative until after he sold his stock. But they ended then. His cause of action then accrued. If he had brought his action at that moment no damages in this respect could have been shown, because the stock could have been bought in the market at a price no higher than that for which he sold, and it did not rise, but fell, in value for a considerable time thereafter. That he did not own five thousand shares of Hawaiian Commercial and Sugar Company stock on borrowed money when on his feet again financially from May to October, 1902, was due to the exercise of his own judgment rather than the deceit of the defendants in inducing him to resign as manager.

The same result is reached if the rule of damages be put in the form in which it oftentimes is in contract cases, that a wrongdoer

may be held responsible in damages for such consequences as may be reasonably supposed to have been in the contemplation of the parties at the time the contract was made. *Leavitt* v. *Fiberloid Co.* 196 Mass. 440, 446. *John Hetherington & Sons, Ltd.* v. *William Firth Co.* 210 Mass. 8, 21. *Globe Refining Co.* v. *Landa Cotton Oil Co.* 190 U. S. 540, 544. The rule sometimes is stated in substantially the same form in actions of tort, so far as relates to consequences of the wrong. *Lane* v. *Atlantic Works,* 111 Mass. 136. *Stone* v. *Boston & Albany Railroad,* 171 Mass. 536. *Glassey* v. *Worcester Consolidated Street Railway,* 185 Mass. 315, 316. *Horan* v. *Watertown,* 217 Mass. 185, 186. See *Thompson* v. *United Laboratories Co.* 221 Mass. 276, 281. It cannot be presumed as a natural result that one obliged by reason of a wrongful pressure to sell stock of great potential though low market value, will continue to remain without that stock when the pressure is removed. Such continued abstinence from ownership of the stock under such circumstances is due, not to the wrongful pressure, but to independent causes.

There is nothing in the record to indicate that the stock exchange quotations which were introduced in evidence by the plaintiff were not accurate as the prices for which stock could be bought as well as sold. The burden was upon the plaintiff to show the nature and extent of his damages.

The exceptional circumstances which, it might be argued, surrounded the plaintiff at the time the deceit was practiced on him so that it could have been found to have been timed to work oppression on him, were removed when the plaintiff obtained his superior new position. A different situation might be presented, if in the meantime the value of the stock had risen so that it would appear that he was compelled to sell in a period of extraordinary and temporary depression. The claim of the plaintiff in this regard was stated at the trial to be that the market prices of the "shares between March, 1901, and January, 1905, were fictitious and were much below the true value of the shares." But long before the end of that period and before their sale price on the stock exchange exceeded the price for which the plaintiff had sold his shares, the plaintiff was in a better financial position, so far as concerned employment, than at the time he disposed of his stock.

There is nothing to show that the fact that the plaintiff's new employment was in Porto Rico was of consequence in this connection. He was well known in San Francisco and it cannot be inferred, in the absence of evidence, that under all the circumstances his being in Porto Rico made any difference.

The misrepresentations upon which the plaintiff relied did not relate to the value of the stock. The plaintiff testified that H. P. Baldwin advised him not to sell it. He could have bought similar stock at about the same price when he was rehabilitated as to profitable employment, and for a considerable period thereafter, but he did not choose to do so. There is no principle of law which permits him to recover as damages flowing as a consequence from the particular deceit here in evidence the large profit which he might have obtained if he had retained the stock until 1905 or later. The ruling that the plaintiff could recover only nominal damages was sufficiently favorable to him. *Hall* v. *Paine,* 224 Mass. 62, and cases there collected and reviewed. *Stewart* v. *Joyce,* 205 Mass. 371.

The plaintiff's claim thus far has been treated as one for damages on loss of stock alone. His statement of claim for damages already quoted seems so limited.

Apparently at the end of the trial, without objection or comment by the judge, the plaintiff made a statement of claim, which may be construed as looking to a more extended field of recovery.* Therefore the case will be considered in its broader aspects.

---

* The plaintiff contended that upon the evidence in the case, he was entitled to claim one million dollars' damages; such damages being based upon the profits that he would have made if he had been left alone, as shown by subsequent events, including crops harvested, the profits earned by the company, the dividends paid to the stockholders and the market value of the stock for a reasonable period following the harvesting of the company's maximum crops resulting from the improvements undertaken during the plaintiff's management.

"The plaintiff further contended that, if the first claim was too broad in law, a narrower and more certain basis of recovery would be to take the stock list for a reasonable time after the corporation began paying out proceeds of crops of fifty thousand tons of sugar, it appearing, according to the plaintiff's contention, that that was the purpose of the improvements installed under the plaintiff's management, and that it was the intention of the parties that the plaintiff should share in the profit derived from marketing fifty thousand ton crops through then holding his five thousand shares of

The plaintiff urges in effect that he is entitled to recover damages for his loss of position, the loss of the gains and profits of the definite understanding of building up the sugar company from a small to a large production, with the consequent share of one twentieth of all profits, which was his proportion of stock ownership, including also the privilege of remaining a member of the pool controlling a majority of the stock, the maintenance of arrangements for carrying his stock on borrowed money upon the footing of being manager of the corporation, and all the financial and other advantages incident to his continuance as manager and being a party to a profit sharing contract.

Prospective profits may be recovered in an appropriate action when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty. They need not be susceptible of calculation with mathematical exactness, provided there is a sufficient foundation for a rational conclusion. *Dennis* v. *Maxfield*, 10 Allen, 138. *Speirs* v. *Union Drop Forge Co.* 180 Mass. 87. *Weston* v. *Boston & Maine Railroad*, 190 Mass. 298. *Moore Spinning Co.* v. *Boston Ice Co.* 210 Mass. 364. *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 380–382. *Loughery* v. *Huxford*, 206 Mass. 324. *Gagnon* v. *Sperry & Hutchinson Co.* 206 Mass. 547. *Neal* v. *Jefferson*, 212 Mass. 517. *Nelson Theatre Co.* v. *Nelson*, 216 Mass. 30. *Burnham* v. *Dowd*, 217 Mass. 351, 360. *Angle* v. *Chicago, St. Paul, Minneapolis & Omaha Railway*, 151 U. S. 1. *Zimmerman* v. *Harding*, 227 U. S. 489, 495. But such damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty. The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of

---

stock, and that he was deprived of such profit by the wrong of the defendants and their associates.

"The plaintiff made a third contention that, if the law demanded a still more narrow rule and he was limited to a recovery of the difference between the real or intrinsic value of the shares at the time of the wrong and the price he got for them when he parted with them in consequence of the wrong of the defendants and their associates, he then was entitled to show the course of subsequent events to find out what the shares were really worth at the time the wrong was committed."

definite profits grounded upon a reasonably sure basis of facts. When the elements, upon which the claim for prospective profits rests, are numerous and shifting contingencies whose relation to the wrong complained of is problematical, and such profits are not provable with assurance as a trustworthy result of the alleged cause, then there can be no recovery. Manifest ambiguities in ascertaining what would have been the course of events in the face of complicated factors, under circumstances which never have come to pass, and inherent difficulties in calculating the amount of prospective gains, prevent the recovery of damages. Pure chances lying between the alleged wrong and the anticipated profits, dependent upon unsettled conditions, render impracticable the assertion of cause and effect. *Noble* v. *Hand,* 163 Mass. 289. *Todd* v. *Keene,* 167 Mass. 157. *John Hetherington & Sons, Ltd.* v. *William Firth Co.* 210 Mass. 8, and cases collected at page 24. *New England Iron Works Co.* v. *Jacot,* 223 Mass. 216, 220. *Doane* v. *Preston,* 183 Mass. 569, 572. *Bernstein* v. *Meech,* 130 N. Y. 354. *United States* v. *Behan,* 110 U. S. 338, 344. *Holt* v. *United Security Life Ins. Co.* 47 Vroom, 585, 596. *Emerson* v. *Pacific Coast & Norway Packing Co.* 96 Minn. 1, 4. *Winslow Elevator Co.* v. *Hoffman,* 107 Md. 621, 640. *Winston Cigarette Machine Co.* v. *Wells-Whitehead Tobacco Co.* 141 N. C. 284. *McKinnon* v. *McEwan,* 48 Mich. 106. *Webster* v. *Beau,* 77 Wash. 444. *Wright* v. *Mulvaney,* 78 Wis. 89. *Paola Gas Co.* v. *Paola Glass Co.* 56 Kans. 614.

The plaintiff's case falls within the latter principle and is governed by the class of cases last cited. The business venture in which the plaintiff embarked was new. It had no established profits or losses in the past with which to compare the anticipated gain of the future. It was an undeveloped sugar plantation. Whether the plantation would reach an annual productivity of fifty thousand tons of sugar, or any highly profitable amount, remained to be established at the time when the plaintiff resigned. At the time of the plaintiff's resignation, the expenditure of large sums of money was required. The procurement of such moneys and the proper financing of the company, in order to carry its indebtedness without wrecking its prospects, demanded financial skill and reputation for sagacity, which must be supplied by others than the plaintiff. At the time of the plaintiff's resignation the financial condition of the company, in view of its bonded and

floating indebtedness and the necessity for further expenditures, and doubts as to the sources from which needed money might be obtained, was such as to cause serious apprehension to its officers according to some of the testimony, an apprehension which seems not to have been unfounded. The ultimate success of the corporation depended also upon the prevailing price of sugar, which upon the evidence varied materially and was not susceptible of being foretold. The plaintiff was a minority stockholder. His freedom of action respecting his stock was somewhat hampered by the pool of which he had become a member. The value of stock of this nature depended in part at least upon the dividends which the corporation might pay. Whether and when it should pay dividends, in view of its indebtedness, was subject to the action of the board of directors, of whom the plaintiff was not one. Value of the stock would be affected also by the confidence of the investing public in securities of this sort and the prevalence of a desire to buy them. The plaintiff had no certainty of tenure in his position as manager. His employment was at will. There was some testimony that he desired to be relieved of his responsibility as manager. He was under no obligation to remain and might resign. He might have been dismissed by the corporation at any time without liability on its part. There was confessedly friction and want of confidence between the plaintiff and the president of the corporation. The president evidently had the confidence of the directors and the holders of the controlling interest in the stock. In the event of contest between the plaintiff and the president, the plaintiff doubtless would have been the one to go. There was evidence tending to show lack of capacity on the part of the plaintiff to deal with the labor and other complications existing on the plantation. The plaintiff was carrying a large part of his stock in the corporation upon borrowed money. There was evidence tending to show his restiveness under such heavy indebtedness, and his desire to be set free from its burden. Apparently the only avenue of escape open to him was to sell his stock. He might have sold a considerable part or the whole of his stock long before the appreciation in its value, for which he hoped, had arrived. Whether the ultimate success of the corporation and the great increase in the value of its stock would have come if the plaintiff had remained in the management, and whether these were not due to

the elimination of the plaintiff and the conduct of his successor as manager, must remain uncertain. The plaintiff seeks to prove that he would have been highly successful in developing this plantation if allowed to remain as manager, in part, by proving that another person, in whom he had no confidence, was highly successful in developing it. The success of Mr. Baldwin under all the circumstances disclosed is not proof that the plaintiff would have been successful. These contingencies would have to be settled in the plaintiff's favor as facts before it could be determined that he had suffered loss. They cannot be settled in his favor without suppositions and surmises which are not susceptible of proof by evidence. The venture upon all the evidence had not reached a sufficiently stable position at the time of the plaintiff's resignation to warrant a reasonably certain forecast of its future. Under all the existing conditions, these uncertainties are sufficient, when grouped together, to show that any attempt to assess damages would compel resort to conjectures as to problematical matters, including the probable action under the strain of venturesome business relations of men lacking confidence in each other, the financial course of a new business requiring large investments of borrowed money for machinery, labor and improvements, a marked increase in the productivity of the plantation, the fluctuations of the stock market respecting a speculative industrial investment, the conduct of the plaintiff in holding or selling stock which he was carrying on borrowed money, and which involved one of his financial resources in heavy indebtedness, and other subsidiary and ancillary facts. Manifestly there can be no reasonable certainty in reaching a conclusion, even approximately satisfactory to a rational mind, as to how all these affairs would have come out if the plaintiff had not resigned. Any damages, if assessed, would rest upon prophecy as to events which did not happen, and not upon proof of facts. It is only by resort to hypotheses which must be largely imaginative that any result could be attained. It goes far beyond an examination of subsequent events, which in some instances is permissible. *Whiting* v. *Price*, 172 Mass. 240. Many of the decisive matters never occurred at all in the way in which they must have happened in order to permit the plaintiff to recover. Whether damages to the plaintiff resulted from the wrong of the defendants, and if they have, what is their

extent, are matters wholly uncertain and conjectural. This is not a sufficiently solid foundation upon which to rest an assessment of damages in an action like the present. That is the inevitable result of the decisions already cited. The same result follows if the case is considered on reason and apart from authority.

This conclusion is not affected by what is said in paragraph 50 and perhaps in other parts of the auditor's report, to the effect that "such profits are not too uncertain or conjectural in the light of subsequent events." These statements doubtless ought to be treated as rulings of law; and as such they are unsound. If, however, they are regarded as findings of fact, they are unwarranted in view of other facts undisputed and found by the auditor. In view of the plaintiff's disclaimer for loss of salary and the other facts, cases like *Lopes* v. *Connolly*, 210 Mass. 487, and *Berry* v. *Donovan*, 188 Mass. 353, afford no support to the plaintiff's claim.

The grounds already considered are decisive against the plaintiff. It is unnecessary to discuss the other points which have been argued. In view of the result reached, the defendants' exceptions are waived and need not be considered.

*Plaintiff's exceptions overruled.*

*Judgment for the plaintiff on the verdict.*

*J. E. Cotter & R. D. Silliman,* of New York, (*J. P. Fagan & J. W. McDonald* with them,) for the plaintiff.

*S. L. Whipple & W. R. Sears,* (*A. Hemenway & E. H. Abbot, Jr.,* with them,) for the defendants.