Harvey **ALBERT**

v.

**WARNER–LAMBERT COMPANY**

No. CIV.A.99–11700–RGS.

United States District Court,
D. Massachusetts.

Dec. 31, 2002.

**102**

Albert P. Zabin, Schneider, Reilly, Zabin & Costello, Boston, MA, for Plaintiff.

Christine M. Netski, Sugarman, Rogers, Barshak & Cohen, David A. Barry, Barshak & Cohen, P.C., Boston, MA, for Defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO PRECLUDE EXPERT TESTIMONY

STEARNS, District Judge.

Plaintiff Harvey Albert had what he thought was a good idea, a daily disposable denture container with a built-in cleansing agent. So apparently did the Patent and Trade Office, which granted Albert a patent on the device. Albert took the idea to defendant Warner–Lambert, the manufacturer of the popular denture cleanser Efferdent®, where it seemed to strike a chord of enthusiasm with senior product managers. Because of a failure of communication (as Warner–Lambert claims), or for reasons of fraud and misrepresentation (as Albert claims), Albert was led to believe that Warner–Lambert was interested in licensing and marketing his "all-in-one" denture cup, when it was not. Albert seeks to recover the lost profits he claims he would have earned had Warner–Lambert not cozened him into forgoing the opportunity to seek independent financing to develop and market the container on his own.

The court, while not unsympathetic to Albert's claims, early expressed doubt about Albert's ability to prove damages. As the court stated in its opinion denying Warner–Lambert's motion for summary judgment:

> While only lightly touched upon by the parties, Albert's prospects may be less clouded by the issues of falsity and reliance than they are by damages. Despite Warner–Lambert's assertion to the contrary, Albert clearly (and properly) recognizes that any claim that he has to lost profits cannot be based on what he might have earned had the negotiations with Warner–Lambert resulted in the agreement he envisioned. Rather his claim is one of lost opportunity and damage to the reputation of his invention. Plaintiff's Opposition, at 4. How real any lost opportunities were is not developed in the pleadings. A relevant fact may be Albert's inability after the failure of the Warner–Lambert negotiations to market his idea in any form. *See Connelly v. Bartlett,* 286 Mass. 311, 315, 190 N.E. 799 (1934) ("Where a plaintiff does not prove that he is worse off than if there had been no misrepresentation he has not made out a case of deceit").

Memorandum and Order of February 7, 2002, at 10 n. 5.

■ It is not that forgone profits are insusceptible of proof, but the proof must be of a sufficient quality to be capable of lending itself to a reasonable calculation of the putative loss, particularly where a pro-

spective venture has, by definition, no history of earnings.

Prospective profits may be recovered in an appropriate action when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty. They need not be susceptible of calculation with mathematical exactness, provided there is a sufficient foundation for a rational conclusion.... But such damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty. The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. When the elements, upon which the claim for prospective profits rests, are numerous and shifting contingencies whose relation to the wrong complained of is problematical, and such profits are not provable with assurance as a trustworthy result of the alleged cause, then there can be no recovery. Manifest ambiguities in ascertaining what would have been the course of events in the face of complicated factors, under circumstances which never have come to pass, and inherent difficulties in calculating the amount of prospective gains, prevent the recovery of damages.

*Lowrie v. Castle*, 225 Mass. 37, 51–52, 113 N.E. 206 (1916), as quoted in *Augat, Inc. v. Aegis, Inc.*, 417 Mass. 484, 488, 631 N.E.2d 995 (1994).

As his expert on damages, Albert enlisted Robert Brandwein, a Boston area marketing consultant. On February 22, 2001, Albert served Warner–Lambert with a "Market Analysis," describing the results of a "pre-test" survey that Brandwein had conducted of 15 potential customers (hospitals and nursing homes) for Albert's denture cup. Brandwein conceded that his conclusions were "preliminary," and "in no way [were] meant to substitute for a complete analysis to determine the market." At his (first) deposition, Brandwein admitted that his "pre-test" methodology was not scientifically reliable as his sample had not been randomly selected nor was it of a sufficient size to permit any accurate extrapolation of the "pre-test" results to the prospective market for denture cups.

On March 19, 2002, over a year after the court's deadline for expert disclosure had expired, Brandwein produced a "Final Report," purportedly by way of supplementation. *Cf. Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 19–21 (1st Cir. 2001). Warner–Lambert immediately objected to the late disclosure, and moved to preclude Brandwein's testimony. On April 24, 2002, the court denied the motion, contingent, however, on Brandwein being made available for an additional four hours of deposition at Albert's expense.[1] At Brandwein's deposition, which was convened on July 17, 2002, it became quickly apparent that Brandwein was unable to answer even the most basic questions about the design and execution of his "final" marketing survey as he had delegated that task (unsupervised) to his daughter, Jennifer Brandwein. After an initial refusal by plaintiff, Jennifer Brandwein was produced for a deposition on November 25,

---

1. At the time, trial was scheduled for August 19, 2002. Given the intervening four months, the court felt that it was not unreasonable to permit Albert a second bite at the apple, if he was willing to accept the sanction and permit Warner–Lambert additional discovery with respect to Brandwein's new (and untimely) expert report. (In retrospect, this was a mistake, albeit a well-intentioned one, on the court's part). The August trial was eventually continued at Albert's request to accommodate his lawyer's vacation schedule.

2002. Following Jennifer Brandwein's deposition, on December 18, 2002, Warner–Lambert filed the instant motion to preclude Robert Brandwein's testimony, together with an affidavit and rebuttal report prepared by its designated expert, Robert L. Klein, the President of Applied Marketing Science, Inc., of Waltham, Massachusetts.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court abandoned the general acceptance test of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), noting the considerable academic and judicial criticism of *Frye*'s ultraorthodox approach to the admissibility of expert testimony based on scientific principles, and finding *Frye* superseded by the more liberal relevancy test of Fed.R.Evid. 702. "That the *Frye* test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence." *Daubert, supra*, at 589, 113 S.Ct. 2786. *Daubert* imposes a duty on federal trial judges to play the role of "gatekeeper," insuring that the factfinding process does not become distorted by "expertise that is *fausse* and science that is junky." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 159, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (Scalia, J., *concurring* ). *See also Wilson v. City of Chicago*, 6 F.3d 1233, 1238–1239 (7th Cir.1993). Two gateposts frame the exercise of a judge's discretion to admit or exclude expert testimony. First, the witness must be shown to be sufficiently qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Second, the Federal Rules of Evidence require that the judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but [also] reliable." *Daubert, supra*, at 589, 113 S.Ct. 2786. "[T]he trial judge must deter-

mine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*, at 592–593, 113 S.Ct. 2786. "The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.... Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert, supra*, at 590, 113 S.Ct. 2786.

A footnote in *Daubert* had led many courts and commentators to conclude that the Supreme Court had intended *Daubert*'s "gatekeeper" provision to apply only to expert opinion based on novel scientific theory and hypothesis and not to opinions based on experience, training, empirical observation, or technical expertise. *See id.*, 509 U.S. at 590 n. 8, 113 S.Ct. 2786. The issue, however, was laid to rest in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "We conclude that *Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also testimony based on 'technical' and 'other specialized' knowledge." *Id.*, at 141, 119 S.Ct. 1167. Justice Breyer, writing for a nearly unanimous Court, emphasized that no bright line divides "scientific" knowledge from other types of knowledge about which experts are called to testify. "[W]hether the specific expert testimony focuses upon specialized observations, the

specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.' ... The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge." *Id.*, at 149, 119 S.Ct. 1167. This is not, however, to say that a full *Daubert* inquiry is required in every case. "The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decided *whether* that expert's relevant testimony is reliable." *Id.*, at 152, 119 S.Ct. 1167. That *Daubert* is properly applied to the screening of expert testimony regarding future earnings and lost profits is no longer a matter of dispute. *See, e.g., Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 570 (D.C.Cir.1993).

■ Robert Brandwein's proffered testimony is based on what is called a concept survey. Surveys of this type are familiar: they have long been in use, and are conducted under standards and protocols that are widely, indeed conclusively, accepted by the survey industry. The essential elements of a reliable concept survey consist of: (1) an accurate, complete and unbiased description of the proposed product, including its price;[2] (2) a random selection within the sampling frame (or universe) of qualified respondents, in this case respondents possessing the authority to purchase Albert's product; (3) responses in a number sufficiently large to yield a statistically significant result with respect to the target universe, that is, a number of sufficient size to permit the calculation of confidence intervals (margins of error);[3] and (4) a uniform format for recording responses to permit a valid comparison of the results. *See generally* Shari Seidman Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Federal Judicial Center (2d ed.2000), at 229–276 ("*Diamond*").

■ As Warner–Lambert points out, the survey conducted by the Brandweins conformed to virtually none of these elements. The description of the denture cup that was used in the survey questionnaire was too vaguely worded to convey a visual image of the product or even a word picture of its appearance.

The All–In–One Denture Cleanser product is a daily, disposable container for storing and cleaning dentures, which may be discarded after a single use, or may be recycled for additional uses. Each container [is] designed with an easily accessible well, [and] can accommodate tablet, powder, gel, crystal, or whitening agents and can be modified in various ways. This new all-in-one system is convenient, efficient and a low-cost method of packaging and marketing a denture care product. Warner–Lambert's Efferdent cleansing tablet was selected as the cleaning agent.

As is clear from the wording, the product description also contained an evident bias, pitching the denture container to a respon-

---

**2.** Industry practice recommends extensive pre-testing of a product description to insure its comprehension and neutrality.

**3.** According to Warner–Lambert's expert, Robert Klein, the industry standard requires a minimum of 200 (and preferably 300) random, qualified responses for the results of a concept survey to be considered statistically meaningful. Robert Brandwein agreed in his first deposition that 200 responses is the accepted minimum.

dent in self-flattering terms: "[a] convenient, efficient and low-cost method of packaging and marketing a denture care product." The survey questionnaire avoided any mention of the prospective price of the "all-in-one" denture cup, or even an offer to discuss pricing, despite Robert Brandwein's acknowledgment that price is the single most influential factor driving consumer purchasing decisions. Unaccountably, the questionnaire never asked whether the respondent would be likely to *buy* the denture container, only whether the nursing home in question would be interested in *providing* an (unspecified) "all-in-one" care denture care product to its patients.

Putting aside the deficiencies in the questionnaire's content, no effort was made to screen respondents to insure that they were "qualified" in the sense that they were actually involved in the purchase of denture products. (Jennifer Brandwein merely asked to speak to someone in "purchasing" at the initiation of the call). Nor was Jennifer Brandwein given any instructions or protocol to insure that refusals or partial responses were record-

ed (or not recorded) in a consistent fashion. This was rather left to her discretion, and as Warner–Lambert points out, she exercised that discretion in what might generously be described as a haphazard manner.[4] Nor was she given any procedure to follow to insure that respondents were being randomly selected in a statistically valid sense (as opposed to being selected by random happenstance).[5]

The truly fatal flaw in the survey, however, is the size of the sample on which the results are based. The sample, which was drawn exclusively from Internet listings of Medicare-eligible nursing homes in southern Florida and the New York City area, consists of only 20 responses (13 if non-qualified respondents are excluded, and 5 if one counts as qualified only those nursing home respondents who reported purchasing denture care products for their residents).[6] From a universe of 20 responses, it is impossible, as Robert Brandwein admitted, to make a calculation of confidence intervals. Thus, the survey's margin of error, cannot be demonstrated.[7]

In sum, I find that the proffered projection of lost profits is based on a survey

4. Jennifer Brandwein, for example, on several occasions, arbitrarily excluded from her sample respondents who clearly indicated a lack of interest in the denture cup. An innate bias in Jennifer Brandwein's interviewing technique may have been implanted by her father, who, as he admitted during his second deposition, had disclosed to Jennifer the client and the role the survey was to play in the litigation. Industry practice requires, wherever possible, that market research be "double blind," that is, that "both the interviewer and the respondent are blind to the sponsor of the survey and its purpose." *Diamond, supra,* at 266.

5. It appears from Jennifer Brandwein's testimony that the principal criterion for inclusion in the survey was the willingness of whomever answered the telephone to participate in the questionnaire.

6. Robert Brandwein stated at his second deposition that the survey was based on a total of 223 *calls* to nursing homes. (The "Final Report" is misleading in this respect as it states at the outset that its results are based "on a telephone survey of 223 Nursing Homes"). As Warner–Lambert's expert, Robert Klein, points out, there is a significant difference between a call and a response. A response rate of less than 10 percent is well below the 50 percent response rate that is considered minimally acceptable. *See Diamond, supra,* at 245 (stating that a response rate below 75 percent should trigger scrutiny, while a response rate below 50 percent "should be regarded with significant caution").

7. The Final Report prepared by Robert Brandwein also purports to project lost profits on sales to hospitals and assisted living facilities. I am at a loss to understand from

methodology so flawed as to be an archetypical example of the kind of "junky" science that *Daubert* commands be excluded from the jury's realm.[8] Moreover, as the survey and Robert Brandwein's testimony about its results constitute Albert's only evidence of damages, judgment must enter for Warner–Lambert.[9]

### ORDER

For the forgoing reasons, the motion of Warner–Lambert to exclude the testimony of Robert Brandwein is *ALLOWED.* Warner–Lambert's motion for summary judgment as to all claims is also *ALLOWED.*[10]

SO ORDERED.

where Brandwein extrapolates these figures as it is conceded that none of the respondents in the survey worked at either of these types of care facility. Brandwein's argument that the similarity between nursing homes and assisted living facilities permits the extrapolation might seem superficially plausible (although assisted living residents generally have more say in the decision to purchase personal health care products than do residents of nursing homes), but there is no basis whatsoever for an extrapolation from the nursing home to the hospital market. Given that I find the survey itself to be fatally flawed, there is no reason to discuss other challenged assumptions that Brandwein used in making his projection of lost profits (such as capture of market share, repeat sales, and the lack of price competition).

8. While Warner–Lambert does not raise the issue, the manner in which the survey was constructed and carried out causes me to question whether Robert Brandwein could be shown to pass the preliminary test of Fed. R.Evid. 702, that an expert be shown to be sufficiently qualified by "knowledge, skill, experience, training, or education." As previously noted, Robert Brandwein delegated the design and execution of the survey to his daughter, Jennifer. As she testified at her deposition, she has had no training or experience in concept surveys (or surveying techniques in general) and had never conducted a "real" survey before this one. She was clearly bewildered by even the most elementary of applicable statistical concepts. Nor was she any clearer on the methodology she had followed in the conduct of the survey itself. On a number of occasions, she professed a lack of memory as to why she had included some responses while rejecting others, or even the meaning of notations she had made on the questionnaire forms while recording a respondent's answers.

9. Plaintiff's Opposition to Warner–Lambert's motion does not address its substance, but only its timing. Normally, this would be an argument worthy of consideration. It does not, however, sit well where the delay in developing the Brandweins' testimony is solely attributable to the late delivery of the "Final Report" and the resistance to making Jennifer Brandwein available. (Jennifer Brandwein was produced for a deposition only after Warner–Lambert, on October 10, 2002, sought leave to compel her testimony). Plaintiff, having been given two bites of his own at the apple, is not in a position to complain that Warner–Lambert has been allowed the same second taste. To the extent that plaintiff argues that the court had previously rejected Warner–Lambert's *Daubert* argument in its April 24, 2002 ruling, and should not therefore allow what in effect is a second motion for reconsideration, the court repudiates that ruling as it did not know (nor could Warner–Lambert have known until the Brandweins' depositions were completed) the full extent of the shoddiness of the survey methodology involved.

10. Judgment must also enter on Albert's non-jury Chapter 93A claims. Money damages are an essential element of a claim brought under section 11 of Chapter 93A (as opposed to section 9, which requires only a showing of an "injury"). *Walsh v. Chestnut Hill Bank & Trust Co.*, 414 Mass. 283, 290 n. 7, 607 N.E.2d 737 (1993).