CAMBRIDGE PLATING
CO., INC., Plaintiff,

v.

NAPCO, INC., Defendant.

Civ. A. No. 90–11605–WAG.

United States District Court,
D. Massachusetts.

Feb. 7, 1995.

Joseph M. Kaigler, Office of the Sol., Cambridge, MA, Brendan M. Hare, David B. Chaffin, Hare & Chaffin; and Kevin P. Sweeney, Cuddy, Lynch & Bixby, Boston, MA, for plaintiff.

Peter Alley, William A. McCormack, Bingham, Dana & Gould; and Richard L. Burpee, Burpee & DeMoura, Boston, MA, for defendant.

### FINDINGS OF FACT AND CON-CLUSIONS OF LAW AS TO M.G.L. c. 93A CLAIM

GARRITY, District Judge.

This diversity action was tried to a jury. At the end of an eleven day trial, on Septem-

ber 22, 1994, the jury returned verdicts for the plaintiff Cambridge Plating Co., Inc. ("Cambridge Plating") on three counts: Count I for breach of contract, Count II for intentional misrepresentation and Count III for negligent misrepresentation, and assessed damages in the amount of $12,183,120 on each count. Further, the jury returned an advisory verdict for the plaintiff on Count IV, finding that the defendant NAPCO, Inc. ("NAPCO") had violated M.G.L. c. 93A. In response to advisory interrogatories posed pursuant to Fed.R.Civ.P. 49(b), the jury informed the court of its specific findings that 1) NAPCO engaged in unfair or deceptive acts, and 2) it did so willfully and knowingly. A copy of the jury's answers to the 49(b) interrogatories is attached as Appendix A.

The matter is now before us pursuant to Fed.R.Civ.P. 52 for a determination of liability and damages under c. 93A, a statutory cause of action to which the right to jury trial does not attach and whose pertinent provisions are as follows:

§ 2. (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

 * * * * * *

§ 11 If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two.

 * * * * * *

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

## FINDINGS OF FACT

Upon a complete review of the evidence admitted at trial, we find the following facts:

1. Plaintiff Cambridge Plating is an electroplating and metal finishing business located in Belmont, Massachusetts. Its plant operations require the use of large quantities of water for bath solutions, to rinse plated parts and perform other functions. Under environmental laws, this water, contaminated by various chemicals employed in the plating and finishing processes, must be treated before it may be discharged into the sewer system. In late 1983, plaintiff solicited bids for the sale and construction of a wastewater treatment system to be installed in its Belmont plant. After considering other offers, it entered into a contract on January 10, 1984 with NAPCO, a company from Terryville, Connecticut under which the defendant agreed to design, sell and install a precipitation wastewater treatment system (the "System") in the Belmont plant. It also agreed to provide training to Cambridge Plating employees, operator manuals, and limited service of the System, as follows:

After start-up of the system, the Seller will provide five (5) days of operator training. This training can be broken into two separate periods if desired by the Buyer.

NAPCO will provide engineering assistance during the first year of operation without extra cost. In the event operational problems cannot be solved over the phone, NAPCO will provide a service engineer within 24 hours, up to a maximum of five (5) additional visits. NAPCO engineers frequently visit Boston, and it is a standard business practice to stop in and inspect the operation of systems when in the area.

2. The contract contained the following "Performance Warranty" whereby NAPCO warranted the System to meet the latest discharge limits set by the Environmental Protection Agency and the Metropolitan District Commission ("MDC"), the regional regulatory agency later succeeded by the Massachusetts Water Resources Authority ("MWRA"):

*Performance Warranty*

This system is warranted to meet the latest proposed requirements of the E.P.A., as published in the July 15, 1983 Federal Register and the local regulatory agency for discharge of heavy metals and cyanide. This warranty is contingent upon the system being operated at a flow not to exceed 145 GPM of non-chelated wastes and 35 GPM of chelated wastes.[1]

3. The contract also contained the following provision purporting *inter alia* to bar any claim for consequential damages:

No claim will be allowed for damages or delays caused by defective materials, or operating failures, including delays in production, whether or not related to the use of, or delivery of any equipment, or for any consequential damage or business loss incurred by Buyer.

4. The purchase price for the System was $398,000. In addition, Cambridge Plating made costly modifications to its Belmont facility in order to accommodate the tanks and equipment for the System and to pipe the wastewater from its plating tanks to the System.

5. The parties originally anticipated that the System would be completely installed by June 15, 1984 and that it would commence operating on July 1. This anticipated schedule was important to plaintiff because it was under increasing pressure from the MDC to implement what the MDC described as its "long overdue" system. New, more stringent MDC standards were to take effect in April 1984. To impress upon the defendant the importance of getting the System in place as soon as possible, Cambridge Plating made a second installment payment to NAPCO on May 22, 1984, approximately two weeks before the payment was due under the schedule then in effect.

6. By September 1984, however, due to problems defendant experienced with delivery of vended items, i.e., materials ordered by NAPCO from its suppliers, and changes in design, the System was still not completely installed. A new deadline of October 31 was set by the parties. Cambridge Plating began sending weekly reports to the MDC on the progress of installation.

7. In September and October, Bobby Triplett, an independent contractor hired by NAPCO, installed the piping for the System. According to defendant's original proposal and subsequent blueprints and drawings, the System was designed to include a part known as a static mixer, to be housed inside a wastewater pipe beyond the point at which a polymer solution is injected into the wastewater flow. The purpose of a static mixer in a precipitation wastewater treatment system is to aid in mixing the polymer solution into the wastewater. When the polymer is properly mixed it serves as a catalyst for flocculation, the process whereby contaminants form large particles which then settle to the bottom of clarifying tanks. The clean water is discharged and the contaminated sediment is properly disposed of. Without proper mixing, good flocculation—a key component of treatment—cannot occur. Triplett, under orders from a NAPCO employee, either Bob DeBisschop or Karl Bredefeld, did not install the static mixer. It is undisputed that defendant never thereafter installed a static mixer in the System.

8. As explained in testimony by Joseph Aliota, defendant's expert engineer, a static mixer is not a necessary part in every precipitation wastewater system. Proper mixing can also be achieved by a combination of right angle bends in the piping both before and after the addition of the polymer stream. In the Cambridge Plating System, however, NAPCO never designed such bends into the System nor was the System ever reconfigured to include such bends after Triplett was ordered not to include the static mixer. The System as installed could not adequately mix polymer and wastewater on a consistent basis.

9. NAPCO never modified or edited the engineering drawings it initially provided to plaintiff which indicated the installation of a static mixer. The drawings thus failed to

---

1. The difference between chelated and non-chelated wastes is not material here; we note, however, that the issues in this case relate only to the non-chelated side of the System. It is undisputed that the System never failed to meet the discharge limits due to flow above the gallons per minute limits set forth in the performance warranty.

reflect that the System as assembled differed in a significant respect from the System as designed. In addition, the control panel NAPCO provided for Cambridge Plating's operators depicted the System as including a static mixer.

10. By October 30, 1984 the System was operating, but only partly. In December 1984, plaintiff was requested by the defendant to "sign off" on the System, but declined on the ground that NAPCO still had not completed installation. Defendant again requested sign-off in February 1985, but once more plaintiff refused because it believed the System was not yet fully installed. Cambridge Plating never returned a completed sign-off sheet to NAPCO.

11. In January 1985, test results obtained by plaintiff indicated that the discharge from the System contained excessively high levels of zinc and nickel. Beverly Fischer, plaintiff's head engineer, told NAPCO's Project Engineer Bob DeBisschop about these results. DeBisschop suggested that Cambridge Plating 1) increase the pH of the wastewater to aid precipitation and/or 2) increase the polymer rate to help flocculation. Although he knew it had not been installed, DeBisschop did not mention the missing static mixer to Fischer (or anyone else connected with Cambridge Plating).

12. From March 1985 to September 1985, the System still suffered from faulty parts and incomplete installation. NAPCO sent technicians to the site to address the mechanical problems and advised Cambridge Plating on correct operational procedures. During this time, plaintiff forwarded six discharge reports to the MWRA. All of these reports indicated that the company was meeting the applicable discharge limits.

13. An issue keenly contested by the parties was whether these six reports prove that the System was working properly, a conclusion urged by the defendant. Two types of evidence negate the defendant's contention, as follows: first, Cambridge Plating operated as a job shop—i.e., different jobs were conducted each day and at various times through the day. Different jobs used different chemicals, leading to different contaminants and concentrations of contaminants in the wastewater. Thus, while the System produced some good results—including those submitted to the MWRA—at other times, depending on the job being performed, the System was not in compliance. Second, plaintiff operated in a "closed loop" mode during part of this time. Closed looping refers to a major modification made to the System by the plaintiff whereby wastewater which had reached the ostensible end of the process without becoming clean enough for discharge was recirculated back to the beginning of the System for multiple trips through it. Until 1989, closed looping was done by means of a flexible hose and a pump. The effect this had was double-edged: multiple trips through the cycle made for cleaner discharge, but since the System could only handle a finite amount of wastewater, it also forced Cambridge Plating to decrease the flow of contaminated water going into the System by decreasing the amount of plating done at the plant. Thus, plaintiff's experience with closed looping helps explain test results which show compliance, but also indicates that the System was not consistently performing as warranted. The readings which indicated compliance with the MWRA standards do not demonstrate that NAPCO fulfilled its obligations under the performance warranty; rather, the System, as delivered and installed, was not capable of consistently meeting the discharge limits as warranted.

14. After September 1985, plaintiff continued to submit reports to the state regulatory agency. These reports show that it often exceeded the applicable discharge limits.

15. Cambridge Plating made its final payment to NAPCO for the System in December 1985.

16. Cambridge Plating achieved record sales of $6,164,000 in fiscal year 1985. After fiscal 1985, annual sales declined rather steadily. (Plaintiff's fiscal year runs from November 1 to October 31; e.g., fiscal year 1985 ran from November 1, 1984 to October 31, 1985. Since the fiscal year policy was adopted by plaintiff in 1982, its total sales figures for that year reflect only ten months

of operations.) The following figures, reflecting plaintiff's net sales for the years 1980 to 1993, have been rounded to the nearest thousand.

| | Net Sales |
|---|---|
| 1980 | $4,336,000 |
| 1981 | $4,078,000 |
| 1982 | $4,151,000 |
| 1983 | $4,759,000 |
| 1984 | $5,200,000 |
| 1985 | $6,164,000 |
| 1986 | $5,848,000 |
| 1987 | $5,393,000 |
| 1988 | $4,803,000 |
| 1989 | $4,764,000 |
| 1990 | $4,794,000 |
| 1991 | $4,069,000 |
| 1992 | $3,241,000 |
| 1993 | $3,229,000 |

In 1984, plaintiff employed approximately 125 workers; at the time of trial, it employed 38.

17. Plaintiff often operated under tight deadlines; it needed to be able to deliver rapid service in order to meet the timetables for production demanded by its customers.

18. In 1985, plaintiff sold $1,081,000 worth of copper plating work to DFM, a division of IBM located in Springfield, Massachusetts. DFM produced copper-plated cold plates for supercomputers. The account yielded only $87,000 in 1986, as DFM shifted its business to a competitor of plaintiff's, Anoplate Corporation in Schenectady, New York. This shift was caused in substantial part by Cambridge Plating's inability to produce plating work fast enough for the production schedule required by DFM. Another of plaintiff's former primary customers, General Electric uses "ability to meet pollution control standards" as one factor in determining the qualifications of a company to bid on GE work.

19. Around March 5, 1986, Tosi spoke with DeBisschop on the telephone and, in a heated discussion, raised his concerns about possible defects in the equipment. DeBisschop responded by pointing once again to operator error as the source of difficulty. Based on DeBisschop's assurances, Tosi believed that operator error was indeed at the root of the problem and therefore took no further steps at that time to have the System

inspected. At no time did DeBisschop or anyone from NAPCO inform plaintiff of the absence of the static mixer.

20. Robert Marullo, one of the Cambridge Plating employees charged with running the System, also called NAPCO representatives, DeBisschop in early 1986 and John Eason in early 1987. Eason was the NAPCO engineer who in large measure designed the System. On each occasion, Marullo asked NAPCO to send a field representative to evaluate the System's continuing problems. Both DeBisschop and Eason responded by advising Marullo to manipulate the polymer flow and pH level. Neither notified Marullo of the absent static mixer.

21. In 1986 and 1987, both Tosi and Marullo were told by NAPCO, either through Eason or DeBisschop, that it would send representatives to the site to examine the System or train plaintiff's personnel if Cambridge Plating agreed to pay $1,000 per day for such service. Tosi, believing that NAPCO would simply continue to blame his personnel for the System's failings, declined the offer.

22. In December 1986, plaintiff hired Patrick Hunt to inspect the System and train Cambridge Plating's personnel in proper operating techniques. Hunt worked as a waste treatment operator for Hewlett–Packard and taught a course at the University of Lowell designed to license wastewater treatment system operators. Hunt found many deficiencies in the operation of the system, including operating deficiencies which he believed were leading to ineffective flocculation, but he did not notice that the static mixer was missing.

23. In May 1987, Bob Capaccio of Mabett & Capaccio, a Cambridge, Massachusetts consulting and engineering firm, requested a variance from discharge limits from the MWRA on behalf of Cambridge Plating. Capaccio visited the facility but failed to detect that the static mixer was not installed. The request for a variance was denied.

24. In September 1987, representatives from Memtek, a wastewater treatment design firm, visited Cambridge Plating to examine the System for the purpose of propos-

ing a course of action designed to bring Cambridge Plating into compliance on a consistent basis. Memtek proposed two alternative plans. The first involved substantial renovation to the existing System and was projected to cost $270,000. The second called for re-engineering the existing System at a cost of $25,000. Plaintiff did not follow through on either proposal. During its visit to the site, Memtek did not recognize that the System did not include the static mixer shown on the engineering drawings and control panel.

25. In March 1988, plaintiff terminated its zinc plating operations because it was unable to meet the MWRA's discharge limits for zinc. Consequently, the paint shop which the company operated to paint zinc-plated parts ceased operations. Twenty-four zinc employees and forty-three painters were discharged. A general demand for plating and finishing work, and specifically for zinc plating and painting work, still existed at the time of the shut down and continued to exist at the time of trial.

26. On December 28, 1988, the MWRA, in a widely publicized move, issued a penalty assessment in the amount of $682,250 against Cambridge Plating for discharging excessive levels of contaminants. After plaintiff disputed the propriety of the assessment, the amount was reduced by agreement to $128,500. Plaintiff incurred $54,000 in attorneys' fees challenging the assessment.

27. On February 13, 1989, Cambridge Plating began "permanent closed looping"—permanent in the sense of a system of hard pipes for closed looping as opposed to the flexible hose and pump theretofore used. If the System operators determined that the discharge was not sufficiently clean, they could now turn a valve and recirculate the wastewater back to the beginning of the System. After February 1989, plaintiff used closed looping on a regular basis.

28. Also in February 1989, plaintiff hired Peter Moleux, an expert professional engineer, to examine the System. Moleux noticed that NAPCO's original proposal, the drawings accompanying it, and the graphic display on the control panel all indicated that a static mixer would be included. However, in his examination of the piping at the location where the static mixer was to be installed, he observed that none of the piping had flanges—metal protrusions at the ends of sections of pipe by which the pipe is welded or cemented to another. Most in-line static mixers have flanges. Moleux concluded that there was no static mixer in the System. He reported this discovery to Cambridge Plating, in a report which included a long list of other mechanical and operational issues he believed needed to be addressed.

29. Geoffrey T. Smith, a sales engineer with Enthone, Inc. who visited plaintiff's Belmont facility with Moleux on February 9, 1989, also informed Tosi, in a February 23 letter, that a static mixer should be installed to mix the polymer solution. On April 18, 1989, Enthone offered to sell Tosi a static mixer for $991. An internal Cambridge Plating memo from Chris Ford, Environmental Director, Chief Operator of the Pollution Control System to Larry Tosi dated August 16, 1989 states that the lack of a static mixer "is a real problem". On September 10, 1989, James Muri, an independent examiner, wrote to Ford that "it is imperative" that he install a mixing device such as a static mixer.

30. Nevertheless, Cambridge Plating did not order a static mixer until December 1989 and it did not arrive in Belmont until late January 1990. There it lay for more than three months, until installed in May 1990. In order to install it operations had to be shut down for one day. The cost of the static mixer paid by plaintiff was $620.00.

31. Thereafter, the System consistently met the MWRA discharge limits, and plaintiff no longer needed to close loop except infrequently.

32. Cambridge Plating filed a voluntary Chapter 11 bankruptcy petition on August 12, 1991 and was permitted to operate as a debtor in possession. A plan of reorganization was confirmed on July 21, 1992.

## CONCLUSIONS OF LAW

The parties have briefed extensively the question of c. 93A liability, raising several issues which we address as follows.

## I. *Statute of Limitations*

Plaintiff filed this suit on June 22, 1990. Actions under c. 93A must be brought within four years after the action accrues. M.G.L. c. 260, § 5A. Usually, a c. 93A claim accrues "at the time injury results from the assertedly unfair or deceptive act." *Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 25 (1993). The injury which arose from the prohibited conduct in this matter indisputably occurred before June 22, 1986. By that time, the System was completely operational, NAPCO had long since failed to inform Cambridge Plating that it had not installed the static mixer, and the System was failing to bring the wastewater discharge within the applicable limits.

▮ Plaintiff therefore relies on the so-called discovery rule to excuse its otherwise tardy filing. "This rule prescribes as crucial the date when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct." *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 205–06, 557 N.E.2d 739 (1990). We must decide whether, before June 22, 1986, Cambridge Plating had "(1) knowledge or sufficient notice that [it] was harmed and (2) knowledge or sufficient notice of what the cause of harm was." *Id.* at 208, 557 N.E.2d 739. In response to 49(b) interrogatory # 1(a) (See Appendix A), the jury found that Cambridge Plating's breach of warranty claim, which is also controlled by a four-year limitation period under M.G.L. c. 106, § 2–725, was not time-barred.

▮ Our consideration of this question applies the test stated by the Court of Appeals in this very case, *Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 29 (1993), in which the precise issue was framed for trial as follows: "Cambridge Plating's ability to invoke the discovery rule—and thus the timeliness of its claims—turns on when the company should have known that NAPCO might be responsible for the water treatment system's failing performance." Our focus must be on whether Cambridge Plating acted reasonably diligently in its attempts to ascertain the cause of harm, not on whether other equally reasonable measures could have led

to the discovery that NAPCO was the source of injury. *Cambridge Plating*, 991 F.2d at 27–8. To address accurately the "should have known" inquiry, it is important to note that:

> "The reasonable person who serves as the standard in this evaluation, however, is not a detached, outside observer assessing the situation without being affected by it. Rather, it is a reasonable person who has been subjected to the conduct which forms the basis for the plaintiff's complaint."

*Riley v. Presnell*, 409 Mass. 239, 245, 565 N.E.2d 780 (1991).

Plaintiff's president Tosi had weighed competing proposals and chose the defendant for the project due to NAPCO's expertise in designing and installing wastewater treatment systems, an expertise on which he reasonably relied. Further, Tosi chose NAPCO because it was willing to guarantee its work through the performance warranty, albeit with the implied condition that plaintiff properly operate the System. The effect of the implied condition to the performance warranty for statute of limitations purposes is that it makes reasonable plaintiff's inability to recognize the existence of its cause of action against NAPCO. As long as NAPCO, the party with the vastly superior knowledge of the workings of pollution control systems, could convince Cambridge Plating that it was responsible for the violations, plaintiff could not reasonably be expected to know the true cause of the harm it was suffering. As of June 1986, Cambridge Plating had been assured frequently by NAPCO that the System was complete and that the equipment was not to blame for the substandard performance. While Tosi had his doubts about these assurances, he reasonably believed, based on the strength of NAPCO's representations and because the system was complex and required sensitive operation, that the problem lay with his operators.

Moreover, NAPCO's failure to install the static mixer was difficult to detect because, from the outside, ordinary pipe and pipe containing a static mixer are quite similar. In his deposition, DeBisschop stated that "If someone didn't know what he was looking

for, I don't think they would know it was a static mixer." The piping in which the static mixer should have been installed was neither visible nor readily accessible to the pollution control operators stationed at the control panel. Finally, the diagrams and the control panel depiction supplied to the plaintiff by the defendant all show a static mixer as an installed component of the System. Under the circumstances, it was not surprising that plaintiff failed to recognize prior to June 1986 that some omission or deficiency on NAPCO's part was the likely cause of the System's deficient performance and its failure to do so was not unreasonable. *Cambridge Plating*, 991 F.2d at 29; *see American Glue & Resin v. Air Products & Chemicals*, 835 F.Supp. 36, 43 (D.Mass.1993).

## II. Actions Primarily and Substantially in Massachusetts

■ Chapter 93A, § 11 states on this point: "No action shall be brought or maintained under this section unless the actions and transactions constituting the ... unfair and deceptive practices occurred primarily and substantially in the commonwealth." Under the statute, defendant has the burden of proving that it is entitled to this exception. c. 93A, § 11 *supra*. NAPCO contends that the only unfair or deceptive act for which it could possibly be held liable consisted of maintaining silence about the missing static mixer from its corporate headquarters in Connecticut. It therefore relies on *Shawmut Worcester County Bank v. First Amer. Bank*, 731 F.Supp. 57 (D.Mass.1990) to support its argument that it comes within the exception. In that case, Shawmut sued a Florida bank which refused to reverse an electronic transfer of $10,000 that Shawmut had mistakenly made from Massachusetts to a depositor's account at the Florida bank. That refusal, and nothing else, formed the framework for the c. 93A claim.

Using *Clinton Hosp. Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1265-66 (1st Cir. 1990) as the basis of our analysis, we focus on three factors: the place where the defendant committed the deceptive or unfair acts or practices; where plaintiff received and acted upon the deceptive or unfair statements; and

where the plaintiff sustained losses due to the unfair or deceptive acts or practices. Factor two weighs heavily in favor of Cambridge Plating which was obviously located in Massachusetts when it received and was influenced by NAPCO's statements and nondisclosure. "The critical factor is the locus of the recipient of the deception at the time of reliance". *Clinton Hospital*, 907 F.2d 1260, 1265-66. As for factor three, the injury to plaintiff occurred exclusively within the Commonwealth.

Regarding the first factor, the wrongful conduct in this instance consisted of more than simple nondisclosure from Connecticut. Triplett, an agent of NAPCO's, failed to install the static mixer while in Massachusetts. NAPCO representatives thereafter visited the Belmont site on various occasions and never informed Cambridge Plating of the System's departure from the specifications and drawings. The depiction of the System on the control panel and the other graphic representations of the System which led Cambridge Plating to believe that a static mixer had been installed were delivered by NAPCO to the Belmont plant and remained in Massachusetts throughout the relevant period. In sum, NAPCO has failed to prove that its unlawful practices did not take place primarily and substantially in Massachusetts.

## III. Unfair or Deceptive Acts or Practices

■ Chapter 93A, § 2(a) makes unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." Plaintiff must prove that the defendant's conduct fell within "the penumbra of some common-law, statutory or other established concept of unfairness, or was immoral, unethical, oppressive or unscrupulous." *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1203-04 (D.Mass.1990). Common law fraud can be the basis for liability under the statute, *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 714, 563 N.E.2d 188 (1990), as can negligent misrepresentation, *Acushnet Fed. Credit Union v. Roderick*, 26 Mass.App.Ct. 604, 607, 530 N.E.2d 1243 (1988). Breach of warranty may, in certain circumstances, also support c. 93A liability. *Knapp Shoes, Inc. v. Sylvania Shoe Mfg.*

*Corp.,* 418 Mass. 737, 746–47, 640 N.E.2d 1101 (1994).

■ As noted *ante,* the jury found NAPCO liable for intentional misrepresentation and negligent misrepresentation. "Deception need not be direct. Declarations of fact and conduct calculated to mislead which do mislead one acting reasonably are enough to constitute fraud." *Kannavos v. Annino,* 356 Mass. 42, 48, 247 N.E.2d 708 (1969). In the c. 93A context, an act or practice is deceptive if it "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Kazmaier v. Wooten,* 761 F.2d 46, 51 (1st Cir. 1985), quoting *Purity Supreme, Inc. v. Attorney General,* 380 Mass. 762, 777, 407 N.E.2d 297 (1980). Here, the deception occurred when NAPCO, which knew throughout that the static mixer was not installed, learned that the System was not performing as warranted and nevertheless 1) failed to reveal knowledge within its possession which would have stemmed the tide of damages being caused by its own misconduct and 2) misdirected plaintiff's attention to operator error as the source of the System's shortcomings. *See V.S.H. Realty, Inc. v. Texaco, Inc.,* 757 F.2d 411, 414 (1st Cir.1985) (if a party to a transaction "does speak with reference to a given point of information, he is bound to speak honestly and divulge all the material facts bearing upon the point that lie within his knowledge"); *Barrett Roofing & Supply Co. v. Ross,* 131 F.Supp. 348, 351 (D.Mass. 1955) (when seller took action designed to reduce the likelihood that purchaser would discover a defect in the goods sold, he was making an actionable misrepresentation).

The defendant argues that it was under no duty to disclose because such a duty cannot be imposed after a contract has been consummated. Restatement (Second) of Torts § 551(2); *County of Hennepin v. AFG Industries, Inc.,* 726 F.2d 149, 153 (8th Cir. 1984) (§ 551 "indicates that the duty to disclose expires when the transaction has been consummated"; "[c]onsummation may be equated with substantial performance"). According to NAPCO, once the System was substantially installed, it had no further obligation to disclose defects which impaired the System's performance. This argument fails for a number of reasons.

NAPCO's deceptive conduct did not simply consist of a failure to speak. It supplied Cambridge Plating with drawings containing a depiction of the static mixer as an actual component of the installed System. These drawings amounted to continuing affirmative representations that the static mixer was installed as promised. *See Craig v. Everett M. Brooks Co.,* 351 Mass. 497, 499, 222 N.E.2d 752 (1967) (when defendant civil engineering firm submitted erroneous plans, and negligently placed surveying stakes it was making actionable representations). Moleux, who NAPCO President Herb Fischman agreed was an expert in the design of wastewater treatment systems, testified convincingly that the failure to modify the drawings so as to conform to the System "as-built" was a "violation of every good engineering practice that's listed."[2] Plaintiff and the experts it hired therefore reasonably expected that the drawings accurately depicted the System as installed at the site.

■ Regardless of these affirmative representations, NAPCO's failure to disclose the knowledge it possessed about the missing static mixer independently supports a finding of c. 93A liability. Under Massachusetts law, parties to a contract are required to abide by the strictures of good faith and fair dealing that are implied in every contract. *See Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471–72, 583 N.E.2d 806 (1991) ("neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). NAPCO gave a warranty of future performance; it was thereby obligated to ensure that the System as installed was capable of meeting the pollution discharge limits. As framed in instructions to the jury, NAPCO was under a duty to reveal that it had not installed the static mixer when "it knew that the discharge limits were

---

2. NAPCO's engineer Eason stated unconvincingly that the depiction of the static mixer was not deleted from the schematics because the part was "minor". However, he was unable on cross examination to identify any other item depicted in the original drawings as being minor.

not being met and that the inclusion of the static mixer would, at least to some extent, enable the system to perform as it was intended." Applying Illinois law, which also implies a duty of good faith and fair dealing in every contract, a Court of Appeals has found common law fraud under circumstances strikingly similar to those presented here.

> "If a product fails to perform in the manner warranted by its manufacturer ... the manufacturer has a duty to reveal to the buyer facts known to it that bear on the cause of the failure and would if revealed enable the buyer to avert or minimize the adverse consequences of the failure. The seller cannot sit idly by while the buyer flails about trying to cope with the failure of the seller's product ... A seller who has reason to know that the failure of his product to perform in the manner warranted is due to a defect in the product can neither keep silent while knowing the nature of the problem nor pretend that the failure is really due to improper installation by the buyer ..."

*AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1040–41 (7th Cir.1990) (internal citations omitted).

■ Further, at issue here is liability under c. 93A, a statutory cause of action. The duty relevant to liability for common law misrepresentation informs the c. 93A inquiry but does not necessarily control it. *See V.S.H. Realty*, 757 F.2d at 417 (c. 93A claims are "not subject to the traditional causes of action such as tort for fraud and deceit ... Massachusetts case law suggests that one difference between a fraud claim and the more liberal 93A is allowance of a cause of action even in the absence of a duty to disclose"). When it became aware that the System was failing, NAPCO should have revealed its installation error; instead it willfully and knowingly declined to advise plaintiff of relevant information within its possession and consequently caused Cambridge Plating to suffer continuing damages. This conduct, viewed as a whole, attains a level of "rascality" warranting a finding of liability under the statute. *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App. 498, 504, 396 N.E.2d 149 (1979).

## IV. Contractual Limitation of Liability

■ At the jury trial, plaintiff sought to introduce evidence of losses in the nature of expenditures it incurred in installing the System. These were excluded on the grounds (a) that, as ultimately modified by addition of a static mixer, the System worked well enough to make the wastewater fit for discharge into the sewerage monitored by MWRA, (b) that whatever system plaintiff purchased, installation expenses of roughly the same amount would be required, and c) that plaintiff never sought rescission of the contract. Except for the $620 it spent for the static mixer,[3] plaintiff's entire claim now is for consequential damages, consisting of the MWRA fine, the attorneys' fees occasioned by the fine and lost profit damages. Defendant points to and relies upon the following contract provision: "No claim will be allowed for ... any consequential damage or business loss incurred by Buyer."

Parties to a commercial contract may validly agree to exclude recovery of consequential damages. M.G.L. c. 106, § 2–719(3); *Canal Electric Co. v. Westinghouse Electric Corp.*, 406 Mass. 369, 373, 548 N.E.2d 182 (1990).[4] In that case, however, the c. 93A count alleged was "merely duplicative" of the traditional breach of warranty claim; there were no allegations of misrepresentation or willful repudiation. *Id.* at 378, 548 N.E.2d 182; *Boston Helicopter Charter v. Augusta*

---

3. This aspect of plaintiff's claim seems properly classified as for direct damage under M.G.L. c. 106, § 2–714.

4. In *Canal Electric*, the Supreme Judicial Court accepted two certified questions from this court. Plaintiff brought claims for breach of warranty and a violation of c. 93A premised on its purchase of defective turbine generator blades. Addressing the breach of warranty claim, the SJC held that a contractual bar to consequential damages was effective against the purchaser, even if a separate contract provision limiting the purchaser's remedy to repair or replacement "failed of its essential purpose." *Canal Electric* at 375, 548 N.E.2d 182. The court went on to hold that the purchaser also could not recover consequential damages under c. 93A. *Id.* at 377, 548 N.E.2d 182.

*Aviation,* 767 F.Supp. 363, 377 (D.Mass. 1991). Here, the c. 93A claim encompasses much more than a simple breach of warranty—this case is thus readily distinguishable from *Canal Electric.* The jury, in response to 49(b) interrogatory # 2(b), found that NAPCO willfully repudiated its warranty obligations. NAPCO warranted, via the "performance warranty", that it would provide a System capable of meeting the applicable discharge limits. The jury evidently believed that NAPCO's conduct amounted to a willful repudiation of its guarantee to install a completely functioning System designed to achieve certain results. The Court agrees and adopts that finding. As such, this matter falls within that class of cases described by the *Canal Electric* court in dictum:

> "We add that consequential damages are awarded in cases in which the facts show willful dilatoriness or repudiation of warranty obligations by the seller. Although in its brief Canal argues willful dilatoriness and repudiation, those facts are in dispute and thus are not properly before us. Our answer (denying recovery of consequential damages) might well be different if such facts were established."

*Id.,* 406 Mass. at 376, 548 N.E.2d 182 (internal citation and footnotes omitted). Cambridge Plating has proved facts which establish willful repudiation of warranty obligations, and hence the contract provision quoted above does not bar an award of compensatory damages in this case.

■ Further, as shown *ante,* NAPCO's actions and inactions constituted misrepresentations. Even after *Canal Electric,* a contractual bar to consequential damages is ineffective when a plaintiff proves a claim under c. 93A predicated on misrepresentation. *Winter Panel Corp. v. Reichhold Chemicals, Inc.,* 823 F.Supp. 963, 974 (D.Mass.1993).

The wrongful conduct for which NAPCO is being held liable in this case is the cover-up of its failure to install a static mixer, or, from another perspective, the repudiation of its obligation under the performance warranty to install a complete workable System. Defendant is not being held liable for damages

for failure to install the static mixer in the first instance—this theory of recovery is barred by the limitation of liability provision of the contract. It is only after NAPCO should have appreciated that the System it installed could not properly mix wastewater and polymer, and nevertheless did not confess what it knew about the absence of a static mixer that it can be held liable. Although Cambridge Plating informed the defendant of problems with flocculation as early as January 1985, NAPCO could still reasonably have believed that, by attending to the System's other mechanical difficulties and providing additional instruction to plaintiff's operators, it could bring the System into consistent compliance. NAPCO did not become legally blameworthy until after the debugging period, which roughly coincides with fiscal year 1985.

## V. *Damages*

■ As with its findings of fact on questions of liability, the Court gives weight to the jury's award of damages in the sum of $12,183,120 on each count. The components of this award are readily identifiable: the fine ultimately paid by plaintiff to the MWRA amounted to $128,500; $54,000 represents reasonable attorneys' fees occasioned by the MWRA fine; and $620 was the cost of the static mixer. These three items total $183,120 to which the jury added an even $12 million for lost profits. We consider this addition and its reduction of plaintiff's lost profits claim by $3,433,000 to have been arbitrary in the sense of being unrelated to specific figures contained in the testimony and analysis of plaintiff's expert Finn, e.g., his total of pollution control expenses amounting to $5,270,082. Probably the jury found, as do we, that damages claimed to have occurred as long as eight years after the defendant's misconduct were too speculative and remote to sustain a compensatory award. Also, like the jury, we conclude that Cambridge Plating has proved that liquidated damages totaling $182,500 were proximately caused by the defendant's wrongful conduct.[5] Whether or not multiple damages

5. For recovery of attorneys' fees in third party litigation caused by the defendant's actions, see generally *Mutual Fire, Marine & Inland Insur-*

*ance Co., v. Costa,* 789 F.2d 83, 88–89 (1st Cir. 1986).

should be awarded under M.G.L. c. 93A is also a straightforward question to be addressed *post.*

We turn now to plaintiff's claim for unliquidated damages amounting to $15,433,000 for net profits it would have earned but for NAPCO's misconduct. The applicable law is well settled. "Damages for lost profits are recoverable only when proof is made with sufficient certainty." *Augat, Inc. v. Aegis, Inc.,* 417 Mass. 484, 488, 631 N.E.2d 995 (1994); *Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 181, 385 N.E.2d 1349 (1979). "The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts." *Augat,* 417 Mass. at 488, n. 4, 631 N.E.2d 995, *citing Lowrie v. Castle,* 225 Mass. 37, 51–52, 113 N.E. 206 (1916). Damages may not be "remote, speculative [or] hypothetical", but neither need they be "susceptible of calculation with mathematical exactness". *Id.* An element of uncertainty is particularly permitted in cases involving business torts, "where the critical focus is on the wrongfulness of the defendant's conduct." *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.,* 14 Mass. App.Ct. 396, 426, 440 N.E.2d 29 (1982). Moreover, "where defendant's wrongdoing created the risk of uncertainty, the defendant cannot complain about imprecision." *Computer Systems Engineering, Inc. v. Qantel Corp.,* 740 F.2d 59, 67 (1st Cir.1984).

### Lost Profits

Finn's testimony was the centerpiece of the damages phase of the trial. Defendant did not call an expert witness as to lost profit damages but rather tried to poke holes in Finn's testimony and challenged some of his hypotheses. Mr. Finn has impressive credentials. He is a certified public accountant, head of an established accounting firm, holder of a Bachelor of Science degree in accounting and a Master's degree in business administration, guest lecturer for ten years

at schools of management, seminar leader at banking institutes and former senior auditor in one of the largest accounting firms in the country. He also has extensive experience in evaluating businesses faced with financial difficulties such as bankruptcies and receiverships. His qualifications to give expert testimony were not questioned by the defense.

Subsequent to the jury trial, in declarations filed on December 2 and 30, 1994, Finn elaborated upon his testimony as to lost profits. Appendices B and C to this memorandum are copies of his computations, the first as to 1986 and 1987 and the latter computing lost profits through 1993 totalling $15,433,000. They are predicated upon a series of hypotheses challenged by the defendant and hereinafter discussed:

First, that, but for the defendant's misconduct, plaintiff's record sales for fiscal 1985 of $6,312,000 (as annualized) would have been sustained in 1986 and thereafter and would have increased annually by $720,000 until 1993.

Second, that the company would have achieved a gross profit margin of 25.5% in each of the years 1986 to 1993, resulting in an annual increase in gross profit of $183,600.

Third, that the difference between projected gross profit and actual gross profit for each year, i.e. lost gross profit, is equivalent to lost net profit.

Fourth, that so-called pollution control expenditures listed in his Exhibit I and appended hereto as Appendix D served in his analysis to reduce or offset projected profits, i.e., were factored into his computation of lost profits.[6]

We accept and adopt much of Mr. Finn's analysis but, for reasons which follow, reject some crucial aspects of it.

### Finn's Methodology

Finn's basic hypothesis was that "annualized" 1985 sales of $6,312,000 would increase each year through 1993 by $720,000,

---

6. In addition to these issues of causation and accounting as to which plaintiff bears the burden of proof, defendant contends and has the burden

of proving that plaintiff failed to mitigate its damages by unreasonably delaying installation of a static mixer. Mitigation is discussed *post.*

producing projected sales for 1986 of $7,032,000, for 1987 of $7,752,000, etc. Actual sales for 1985 totalled $6,164,000. Finn arrived at the higher figure of $6,312,000 by taking sales for the first half of 1985 and multiplying by two. This was proper, in his opinion, because the System was not operational until midway through 1985. Therefore, Finn reasoned, first half sales were not affected by the inadequacies of the System while second half sales were. While there may be some technical justification to this conclusion, it conflicts with and is unsupported by relevant evidence. The System was only partially complete for the entire fiscal year of 1985. There was no dramatic event occurring midway through fiscal 1985 which would warrant the division adopted by Finn. A year is a year is a year. All other performance figures employed by him were annual figures. Therefore we use in our computations the actual 1985 figure posted by the plaintiff, $6,164,000, which is still by far the largest in plaintiff's history.[7]

The projection of an annual increase in sales of $720,000 rests upon Finn's method of calculating the average yearly increase in sales actually achieved by Cambridge Plating during the four year period from 1982 to 1985. NAPCO urges us to reject Finn's focus on 1982 to 1985, in favor of an analysis whereby sales figures from 1980 and 1981, years in which sales failed to keep pace, would also be averaged with the 1982–1985 figures. While it is apparent that including sales figures from 1980 and 1981 would lower the average yearly increase in sales below the $720,000 figure employed by Finn, it is not equally apparent that including those figures (and excluding figures from years prior to 1980 when sales increased dramatically) would provide a more accurate projection of Cambridge Plating's future growth absent NAPCO's wrongful conduct. Placing more weight on recent past performance seems to the Court reasonable under the circumstances. Finn's calculations producing

the $720,000 figure are as follows: $608,000 (the difference between 1982 sales of $4,151,000 and 1983 sales of $4,759,000) plus $441,000 (the difference between 1983 sales and 1984 sales of $5,200,000) plus $1,112,000 (the difference between 1984 sales and 1985 "annualized" sales of $6,312,000) adding up to a total of $2,161,000 divided by three, equalling an average of $720,000.

We have already explained our reliance upon the actual 1985 sales figure and rejection of an annualized one. Further, without explanation or justification, Finn used a 1982 sales figure improper for comparison purposes in computing the difference in sales between 1982 and 1983. In 1982, plaintiff converted from a calendar year to a fiscal year ending October 31 for accounting purposes. Plaintiff's financial data for 1982, including its sales figure of $4,151,000, reflect only ten months of operations, from January 1, 1982 to October 31, 1982. Thus, it was error to compare this ten month figure to the 1983 figure which encompasses twelve months of sales. Hence we have formulated an alternative prorated sales figure for 1982 based on the following calculations: (1) ten month sales of $4,151,000 equals monthly sales, rounded to the nearest thousand, of $415,000; (2) monthly sales of $415,000 for a twelve month period equals $4,981,000.[8] Using that sales figure for 1982, $4,759,000 for 1983, $5,200,000 for 1984 and $6,164,000 for 1985, our calculation of the average annual sales increase for the years 1982 to 1985 becomes: a loss of $222,000 (the 1982–83 decrease) plus $441,000 (the 1983–84 increase) plus $964,000 (the 1984–85 increase) for a total of $1,183,000 divided by three, producing an average of $394,000.

We conclude that $394,000 is a reasonable estimate of the annual sales growth Cambridge Plating would have realized but for NAPCO's deceptive acts and use that estimate in our computations.

---

7. We have considered carefully the propriety of using an average figure for the four years 1982–1985 which comes out to $5,276,000, instead of 1985 sales, or for that matter any single year, as the base for projected additions. We did not adopt this approach, however, because, in this context, averaging seems better suited to changes than to results.

8. An identical figure is obtained by adding $830,000, two months at $415,000, to the ten month total of $4,151,000.

## Causation

■ The "but for" element in Finn's first hypothesis covers the requirement that plaintiff prove that its decreases in sales were proximately caused by NAPCO's wrongful conduct. Plaintiff has met its burden. By all accounts, before 1986 plaintiff was a thriving business which had been growing at a faster rate than the industry average. Finn, Tosi and Alfred Jacques (an employee of General Electric, a former Cambridge Plating customer) all testified, albeit to varying degrees, that there has been and still exists a general demand for plating work such as done by plaintiff. The plating and finishing business is extremely time sensitive. Because of the necessity to close loop, Cambridge Plating was unable to process its plating work fast enough to satisfy its clients and was forced to turn away orders. This resulted in the permanent loss of customers.

Another strong proof of causation centers on the $682,250 fine levied against Cambridge Plating by the MWRA in December 1988 and the widespread publicity it generated. Although this does not become a factor until after December 1988, by which time plaintiff had already sustained a sizable drop in sales, we infer that the negative publicity confirmed any doubts potential clients had concerning plaintiff's ability to produce work on time. Jacques testified that GE used "ability to meet pollution control standards" as one factor in determining the qualifications of a company to bid on GE work. Even NAPCO's DeBisschop agreed that a company fined by the state regulatory agency for violating pollution standards would tend to lose sales.

■ Our principal quarrel with Finn's first hypothesis is that it allows "the causation claim to run out too far into the future." *Augat, Inc. v. Aegis, Inc.,* 417 Mass. 484, 491, 631 N.E.2d 995 (1994). Plaintiff claims lost profit damages for 1992 and 1993, even though it installed the static mixer in May 1990 and concedes that thereafter the System performed satisfactorily. On cross-examination, Finn was questioned about plaintiff's reliance on sales to a select number of customers and the loss of these accounts after 1985. He testified that plaintiff could

survive the loss of these primary customers due to the effectiveness of its sales force; he believed that, at least in 1985, the sales force could replace one customer with another "almost immediately".

Another event relevant to 1992 and 1993 was plaintiff's bankruptcy in August 1991, over one year after installation of the static mixer. Since the System performed as warranted after the part was put in place, Cambridge Plating had a full year of operating in compliance with the MWRA standards in which to recover sales. Instead, sales dropped from $4,794,000 in 1990 to $4,069,000 in 1991; thereafter continuing to fall to $3,241,000 in 1992 and $3,229,000 in 1993. While it is reasonable to infer that the bankruptcy engendered lost sales in 1992 and 1993, plaintiff failed to show a causal connection between NAPCO's misconduct and plaintiff's bankruptcy.

We decline to extend plaintiff's damage claim to 1992 and 1993 for a further reason. As a possible alternative which he rejected, Finn presented evidence of the comparable industry average in sales. His chart showed that if plaintiff had grown at the industry average rate, its sales would have increased each year—but not nearly by $720,000. For 1986 to 1993, if Cambridge Plating had grown in step with the industry average, it would have enjoyed an average annual increase in sales of just $75,250, about 10.5% of the forecast made by Finn. In addition to this large discrepancy, another interesting item appears in the industry average data: the industry average sales grew by 2% each year for the period 1985 to 1990, but only .3% in subsequent years. This shift in percentage growth highlights the problems inherent in extending the claimed causal connection for eight years. We do not know what caused this shift in percentage growth but its existence also casts doubt on plaintiff's submission that, absent NAPCO's conduct, it would have continued to grow at a steady rate through 1993.

Based upon a complete review of plaintiff's projected lost profits claim, we conclude that it has failed to sustain its burden of proving that the defendant's conduct caused any lost profit damages for fiscal 1992 and 1993. In

the Court's view, the claimed damages for these years are "remote, speculative, hypothetical and not within the realm of reasonable certainty." *Augat, supra* at 488, n. 4, 631 N.E.2d 995, quoting *Lowrie v. Castle*, 225 Mass. 37, 51, 113 N.E. 206 (1916).

### Gross Profits

Finn's hypothesis that plaintiff's gross profit margin for 1986–93 would be 25.5% was based on the average gross profit margin achieved by Cambridge Plating from 1982 to 1985, the same years he used in predicting plaintiff's net sales. The defendant again asserts that Finn's choice of 1982–85 figures is flawed because the company performed best in this interval, and other years in which the gross profit margin was smaller should have been included in his calculation. We disagree for the same reasons we accepted Finn's decision to base his sales projections on 1982–85 figures, principally the thoroughness of his investigation and use of the most recent data. The soundness of any economic forecast for as long as six or eight years may be doubted. Finn's is a judgment call which we accept in the absence of conflicting expert testimony, mindful that damages need not be proved with mathematical certainty, and because the jury so found.

Using annual sales increases of $394,000, as explained *ante*, the 25.5% margin produces a projected annual gross profit increase of $100,470, rather than the $183,600 which Finn derived from annual sales increases of $720,000.

### Net Profits

■ Heeding the legal principle that lost profits must be proved in terms of net profits,[9] *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 175 n. 15, 385 N.E.2d 1349 (1979), Finn equated lost gross profits [10] with lost net profits by finding that SG & A expenses remained virtually constant in periods of increasing sales. In his words, lost gross profit "fell to the bottom line" as lost net profit.

NAPCO once more asserts that, by selecting certain base years and rejecting others, Finn's analysis is deceiving. It points to the period from 1980 to 1985 when net sales grew 42.3% while SG & A expenses increased by 50.9%. Finn counters that from 1978 to 1980 sales increased by 64.6% while SG & A remained virtually constant as a dollar figure, and that for 1982–84 sales were up 30.4% and SG & A grew by only 12.1%. Given Finn's qualifications and the apparent reasonableness of his conclusions, we adopt his premise. Having made the tactical decision not to introduce expert testimony of its own, defendant "cannot now complain about the jury's and judge's reliance on the only evidence on damages which was presented." *Computer Systems*, 740 F.2d at 67.

### Pollution Control Expenses

Whether or not Finn properly accounted for expenses incident to the acquisition and operation of the System became an issue of surpassing significance because of the size of the expenditures totalling $5,270,082, consisting of ten different types of expenses, set forth in a schedule prepared by Finn and attached hereto as Appendix D. This issue was not addressed to the Court's satisfaction at trial and, at its invitation, the parties submitted various post-trial filings. It was undisputed that plaintiff's projected sales subsequent to its purchase of the System should be offset, *inter alia*, by the expenses of running it. What was disputed, and keenly, was whether Finn's analysis involved such an offset.

■ The methodology employed by Finn was described in a so-called declaration attached to plaintiff's filing on December 2, 1994, as follows:

The expense in operating the pollution control system is utterly irrelevant to that incremental computation and such costs were already included in and deducted from any computation of lost profits which I made and presented to the Court. I had already suppressed profit by the amount of pollution control expenses because I com-

---

9. Net profits are gross profits minus other expenses, so-called Sales, General & Administrative Expenses ("SG & A").

10. Gross profits are net sales minus cost of goods sold, which includes material, direct labor and overhead expenses.

puted only *incremental* profit as a contribution to net and *did not* deduct any losses (as Napco now does for purposes of its proposed analysis). This is in part why, in my full report (Trial Exhibit S) I separately stated the costs of the pollution control system and they were not duplicative of my computation of lost profits. Stated another way, the existing gross profit from existing sales which I *deducted from* my hypothesis of additional profits from further sales already had factored into it all costs actually incurred by Cambridge Plating for pollution control. Thus, to deduct them again, as Napco apparently now urges, would be to double count them and penalize Cambridge Plating twice for the same costs.

In response to the court's memorandum and procedural order dated December 20, 1994 plaintiff filed a further statement undertaking to explain "the fundamental basis of Mr. Finn's opinion" as follows:

The remainder of the Declaration and the other two Exhibits explain the fundamental basis of Mr. Finn's opinion: that he calculated lost profit by stating what the profit should have been and subtracting what the profit actually was. Of course, the figure for what the profit actually was included the amount Cambridge spent on expenses such as pollution control. Thus, *deducting what the profit actually was from the profit that should have been serves to fully account for pollution control expenses,* and to deduct them again would be to double-count them. [Emphasis added]

For reasons that follow, the Court finds that Finn's analysis incorporates fundamental errors which preclude its adopting his conclusions as to lost gross profits.

In our opinion, Finn's gross profit analysis compares apples with oranges, i.e., profits before and after installation of the pollution control system.[11] Contrary to the implica-

tion in his characterizing projected profits computed by him as "incremental" and "additional", they are not added to or built upon profits earned by the plaintiff in the years in question. The contrasted gross profit figures are arrived at wholly independently, without projected profits being connected in any way with the actual sales or expenditures by the plaintiff in the years at issue. This is evident from the computations set forth in Appendix B. For example, take projected sales of $7,032,000 for 1986. This figure is not derived from actual 1986 sales of $5,848,000. Similarly, projected 1986 cost of goods sold amounting to $5,239,000 is not built upon nor derived from actual cost of goods sold of $4,885,000. True, actual cost of goods sold were increased and actual gross profit correspondingly decreased by 77% of total pollution control expenditures for 1986 amounting to $689,665 and the remaining 23% of such expenditures were added elsewhere as costs of the plaintiff's operations in 1986, likewise reducing actual profits. Apparently Mr. Finn deduced that projected profits for 1986 were similarly reduced. But there has been no such reduction. Projected profits are no more or less than a fixed 25.5% of a total sales projection flowing from years before the System was installed. The sole, if unintended, function of pollution control expenses in Finn's calculations is to reduce actual profits in the years at issue, thereby increasing the difference between actual and projected profits which in turn increases the lost profits claimed by the plaintiff. In sum, plaintiff's lost gross profits claim hinges on the mistaken assumption that actual expenses reduced projected gross profits.

This failure to factor pollution control expenses into projected profits is corroborated by a comparison of gross profit percentages before and after installation of the pollution control system. Claimed projected gross profits for 1986 and thereafter are at the rate of 25.5%. However, figures for actual opera-

11. The same point is made in NAPCO's filing on December 30, 1994:

In effect, Finn equated two entirely different companies with entirely different cost structures. Cambridge *without* a treatment system was one company with its own cost structure. Cambridge *with* a treatment system was a dif-

ferent company with a different, higher cost structure and lower profitability. The historical profitability of the company *without* the expenses of a treatment system cannot provide any basis for projecting the profitability of the company *with* the expenses of treatment system.

tions show much smaller gross profit margins. The computations made in Appendix B list an actual gross profit margin of 16.5% for 1986, based upon inclusion of only 77% of pollution control expenses in cost of goods sold. If, for simplicity of analysis, the other 23% be switched from interest expense and SG & A expense to cost of goods sold, amounting to $158,365, gross profits would be reduced to $804,600 and gross profit margin to 13.8%. In 1987 pollution control expenses amounted to $570,473 of which $394,548 was included in cost of goods sold and $131,000 omitted. A similar switch of all pollution control expenses to cost of goods sold would reduce the gross profit margin to less than 5% or less than one fifth the rate used by Mr. Finn in projecting lost gross profits. Thus, it is readily apparent that projections showing so much larger gross profit percentages than those actually achieved were due to omission of expenses of some type from the computation.

■ A further problem with Finn's analysis is that it conflicts with a ruling made explicitly by the Court during the trial when the Court excluded as an element of plaintiff's damages its costs of acquiring and installing the NAPCO System. As explained by the Court at the time, plaintiff never attempted to rescind the sale; it was obligated to pay the contract price for a system it had purchased and kept and used. The Court expressly excluded interest expenses claimed in paragraph 23(g) of the complaint which by the time of trial had increased to $1,027,712. Nevertheless, by reducing plaintiff's actual profits by deferred acquisition costs in the nature of interest expense totalling $1,083,509 over the eight year period in question under the rubric of pollution control expenses, plaintiff increases the spread between actual and projected profits and correspondingly its damages. Annual deductions for depreciation totalling $1,441,029 are probably also violative of the Court's evidentiary ruling.

Accordingly, plaintiff's claimed lost gross profits will be reduced for each year by the amount of pollution control expenses incurred by the company in that year.

## VI. *Mitigation*

■ Plaintiff had a duty to mitigate its damages. *Burnham v. Mark IV Homes, Inc.*, 387 Mass 575, 586, 441 N.E.2d 1027 (1982) ("a plaintiff may not recover for damages that were avoidable by the use of reasonable precautions on his part"). The burden of proving that losses could have been avoided by reasonable effort falls on NAPCO. *American Mechanical Corp. v. Union Machine Co. of Lynn, Inc.*, 21 Mass.App.Ct. 97, 103, 485 N.E.2d 680 (1985). Once Moleux informed Cambridge Plating that the System was missing a vital part, it was obligated to take steps to remedy the situation. The obvious step was to buy and install a mixer immediately. Plaintiff, however, failed to do so until May 1990, 15 months after receipt of Moleux's report. That was an unreasonable delay.

■ Cambridge Plating argues that its delay was reasonable because: 1) the absent static mixer was just one of thirty-one concerns raised by Moleux, and Tosi reasonably chose to address these other concerns first; 2) since the static mixer was housed within a working pipe, the plant operations would have to be shut down for some period of time in order to install the missing part; 3) Tosi did not want to install the static mixer on his own because he feared losing the protection of the NAPCO warranty. Taking these arguments in turn: 1) the record reveals that plaintiff had more than adequate notice that the static mixer was a vital part of the System, one deserving of immediate attention; specifically, two independent experts, Geoffrey Smith from Enthone, Inc. and James Muri, informed Tosi that a static mixer was needed—a conclusion that did not escape the attention of others at Cambridge Plating, as evidenced by the internal memo from Chris Ford; 2) Tosi's recollection of events, that installation necessitated suspending the plant's operations from a Saturday afternoon to a Thursday morning, conflicted with reliable documentary evidence (specifically, Exhibits 139 and 167) supporting our finding that the shut down was for only one day; and 3) regarding Tosi's alleged warranty concerns, these conflict with his making unilaterally other modifications to the System, both

before and after Moleux's report. In all, there is no supportable reason why Cambridge Plating delayed as long as it did. In the Court's opinion, defendant has proved by a preponderance of the evidence that plaintiff readily could have acquired a static mixer promptly after February 1989 and owed a duty to install it within a few months of Moleux's discovery. In sum, plaintiff failed to mitigate its damages reasonably and otherwise allowable damages for 1990 and 1991 must be reduced.

■■■ The extent of an appropriate reduction is difficult to quantify. Defendant asserts that plaintiff's unreasonable failure to install the static mixer promptly should result in a finding of no recoverable lost profit damages after six months from February 1989, the date of Moleux's report. We do not agree. Even if it had reacted properly to Moleux's findings and recommendations, we think it would have taken more than six months thereafter for plaintiff to have recovered from the injurious effects of NAPCO's conduct. Whenever installed, the effect on plaintiff's sales would have been gradual and progressive, as it restored its reputation as a company capable of meeting the strict environmental demands placed on the industry. The time frame or pace of such a gradual process cannot be stated with certainty. Our best estimate and consequent order is that, with reasonable mitigation, plaintiff's damages for 1990 would have been half the sum otherwise demonstrated and for 1991 one-quarter of that amount. The mathematics of this ruling are as follows:

**Damages for 1990 and 1991**

| | Pre Mitigation | Post Mitigation |
|------|----------------|-----------------|
| 1990 | $ 843,000 | $422,000 |
| 1991 | $1,207,000 | $302,000 |

## VII. Double Damages

■■■ In response to 49(b) interrogatory # 5(b), the jury found that NAPCO knowingly and willfully engaged in unfair or deceptive acts in dealing with plaintiff. M.G.L. c. 93A, § 11 compels an award of "up to three, but not less than two, times" actual damages if the court finds a willful or knowing violation. We have found that the defendant knew (a) that the static mixer was missing and (b) that informing plaintiff of that fact or offering to install the missing part itself would likely have enabled Cambridge Plating to meet MWRA requirements. But NAPCO chose neither course; instead it was content to ignore the problem and hope that it would somehow resolve itself. This is not a case where the defendant did all it could to repair or replace faulty goods. Cf. *VMark Software, Inc. v. EMC Corp.*, 37 Mass.App.Ct. 610, 621–24, 642 N.E.2d 587 (1994) (where defendant earnestly tried to overcome intractable problems inherent in the computer software system it sold to plaintiff, it did not have sufficiently culpable state of mind to warrant double damages). Rather, NAPCO believed that it could disregard its obligations under the performance warranty and fail to speak the truth when asked directly about problems with flocculation. *See Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 780, 489 N.E.2d 185 (1986) ("[a]ctions involving fraudulent representations in knowing disregard of the truth encompass culpable, 'willful' behavior under the statute"). In the Court's opinion, double damages are warranted and appropriate.

In conformity with the aforesaid conclusions of law, we have calculated lost profit damages as follows,[12] rounding all of our figures to the nearest thousand:

| 1986 | Projected Sales | $6,558,000 |
|------|------------------|------------|
| | Projected Profit | $ 982,000 |
| | Actual Profit | $ 963,000 |
| | Lost Profit | $ 19,000 |

| 1987 | Projected Sales | $6,952,000 |
|------|------------------|------------|
| | Projected Profit | $1,203,000 |
| | Actual Profit | $ 267,000 |
| | Lost Profit | $ 936,000 |

| 1988 | Projected Sales | $7,346,000 |
|------|------------------|------------|
| | Projected Profit | $1,351,000 |
| | Actual Profit | $ 440,000 |
| | Lost Profit | $ 911,000 |

| 1989 | Projected Sales | $7,740,000 |
|------|------------------|------------|
| | Projected Profit | $1,336,000 |
| | Actual Profit | $ 746,000 |
| | Lost Profit | $ 590,000 |

12. Projected profit is calculated by taking 25.5% of projected sales and subtracting the pollution control expenses incurred in that year. Projected profit is then compared with actual profit to arrive at lost profit.

| 1990 | Projected Sales | $8,134,000 |
|------|-----------------|------------|
| | Projected Profit | $1,470,000 |
| | Actual Profit | $ 627,000 |
| | Lost Profit | $ 843,000 |
| | After Mitigation Reduction | $ 422,000 |
| 1991 | Projected Sales | $8,528,000 |
| | Projected Profit | $1,589,000 |
| | Actual Profit | $ 382,000 |
| | Lost Profit | $1,207,000 |
| | After Mitigation Reduction | $ 302,000 |
| Total Adjusted Lost Profit | | $3,180,000 |

## CONCLUSION

Plaintiff's compensatory damages, consisting of lost profit damages of $3,180,000, $182,500 in damages attributable to the MWRA fine and $620 for the cost of the static mixer, amount to $3,363,120. Having agreed with and adopted the jury's findings that NAPCO violated c. 93A willfully and knowingly, the Court doubles the compensatory damages to $6,726,240 pursuant to c. 93A, § 11.

 Since the c. 93A violation is premised on the same underlying facts as the common law counts decided by the jury, the awards are not cumulative. *Refuse & Environmental Systems, Inc. v. Industrial Services of America, Inc.,* 932 F.2d 37, 42 (1st Cir.1991); *Calimlim v. Foreign Car Centers, Inc.,* 392 Mass. 228, 235, 467 N.E.2d 443 (1984). Cambridge Plating is entitled to reasonable attorneys fees and costs incurred by it with respect to its c. 93A claim. In that connection, plaintiff shall file within fourteen days applications supported by a legal memorandum and detailed affidavits to which defendant may reply within ten days.

On the basis of the foregoing, it is hereby ORDERED that:

1) the plaintiff Cambridge Plating Co., Inc. recover of the defendant NAPCO, Inc., on Count I, breach of contract, the sum of $12,183,120;

2) on Count II, intentional misrepresentation, the sum of $12,183,120;

3) on Count III, negligent misrepresentation, the sum of $12,183,120;

4) on Count IV, violation of M.G.L. c. 93A, § 11, the sum of $6,726,240.

## APPENDIX A
### 49(b) INTERROGATORIES

1. a) Should plaintiff Cambridge Plating reasonably have known before June 22, *1986* of the facts giving rise to its cause of action against defendant NAPCO?

 | yes | X no |
 |-----|------|

 b) Should plaintiff Cambridge Plating reasonably have known before June 22, 1987 of defendant NAPCO's failure to install the static mixer?

 | yes | X no |
 |-----|------|

2. a) The contract between the parties included a performance warranty by which defendant NAPCO warranted that the System would meet applicable discharge limits when operated properly. Was such warranty breached substantially by the defendant NAPCO?

 | X yes | no |
 |-------|------|

b) Did defendant NAPCO willfully delay in fulfilling its performance warranty or repudiate its warranty obligations?

X
_____
yes _____
 no

c) By sending the defendant NAPCO a copy of a draft complaint on March 17, 1989, did plaintiff Cambridge Plating give defendant NAPCO notice of NAPCO's alleged breach of the performance warranty within a reasonable time after Cambridge Plating knew or reasonably should have known of NAPCO's breach?

X
_____
yes _____
 no

3. a) Did defendant NAPCO intentionally conceal from plaintiff Cambridge Plating NAPCO's failure to install the static mixer while aware of the System's failure to meet applicable discharge limits?

X
_____
yes _____
 no

b) If so, did NAPCO's failure to install the static mixer have a material and negative effect on the System's ability to meet applicable discharge limits?

X
_____
yes _____
 no

4. a) Did defendant NAPCO act negligently in failing to inform plaintiff Cambridge Plating of NAPCO's failure to install a static mixer?

X
_____
yes _____
 no

b) Did plaintiff Cambridge Plating negligently fail to discover that NAPCO had not installed a static mixer?

 X
_____ _____
yes no

c) If yes to both a) and b), what is the percentage of each party's respective negligence?

NAPCO _____%
Cambridge Plating _____%
Total . 100%

5. a) Did defendant NAPCO engage in unfair or deceptive acts in dealing with plaintiff Cambridge Plating?

X
_____
yes _____
 no

b) Did defendant NAPCO do so willfully and knowingly?

X
_____
yes _____
 no

EXHIBIT II

1986 & 1987 NET PROFIT COMPUTATION

(All Numbers in Thousands)

| | 1986 | | | 1987 | | |
|---|---|---|---|---|---|---|
| | ACTUAL | DIFFERENCE | PROFITS COMPANY SHOULD HAVE MADE | ACTUAL | DIFFERENCE | PROFITS COMPANY SHOULD HAVE MADE |
| Net Sales | 5848 | 1184 | 7032 | 5391 | 2359 | 7752 |
| Cost of Goods Sold | 4885 * | 354 | 5239 | 5124 *1 | 649 | 5775 |
| Gross Profit $ | 963 | 830 | 1798 | 267 | 1710 | 1977 |
| % | 16.5 | ---- | 25.5 | 5.0 | ---- | 25.5 |
| Selling, General & Admin. | 1059 ** | ---- | 1059 | 985 *4 | ---- | 985 |
| Interest Expense | 242 *** | ---- | 242 | 257 *** | ---- | 257 |
| Net Profit/Loss | (338) | 830 | 492 | (975) | 1710 | 735 |

* Includes 77% of pollution control expenses.
** Includes remainder of non-interest pollution control expenses.
*** Includes pollution control interest expenses.

APPENDIX C

EXHIBIT 111

| ALL NUMBERS IN THOUSANDS | | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Total Sales Hypothesized (Ex. 173) | 7,032 | 7,752 | 8,472 | 9,192 | 9,912 | 10,632 | 11,352 | 12,072 | 76,416 |
| B | 25.5% of Total Sales | 1,793 | 1,977 | 2,160 | 2,344 | 2,528 | 2,711 | 2,895 | 3,078 | 19,486 |
| C | Actual Sales (Ex. 151, 173) | 5,848 | 5,393 | 4,803 | 4,764 | 4,794 | 4,069 | 3,241 | 3,229 | 36,141 |
| D | Pollution Control (Ex. 148, As Supplemented) | 690 | 570 | 522 | 638 | 604 | 586 | 513 | 455 | 4,578 |
| E | Actual Gross Profit (Ex. 151)* | 963 | 267 | 440 | 746 | 627 | 382 | 320 | 308 | 4,053 |
| F | Lost Profit As A Contribution to Net (B Minus E) | 830 | 1,710 | 1,720 | 1,598 | 1,901 | 2,329 | 2,575 | 2,770 | 15,433 |
| G | Actual Profit (Loss) (EX. 151)** | -293 | -955 | -478 | -132 | -153 | -416 | 084 | -425 | -2,768 |
| H | Lost Profit Claim Without Pollution Control (B Minus G) | 2,086 | 2,932 | 2,638 | 2,476 | 2,681 | 3,127 | 2,811 | 3,503 | 22,254 |

\* After Deduction of Various Pollution Control Expenses
\*\* After Deduction of Any Remaining Pollution Control Expenses

## EXHIBIT I

Schedule of Pollution Control Expenditures

| | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Payroll & Benefits | $47,803 | $45,965 | $63,554 | $64,622 | $97,710 | $80,943 | $72,231 | $57,052 | $88,418 | $618,298 |
| Outside Labor | $7,105 | $5,299 | $4,160 | $8,640 | $61,915 | $21,580 | $23,090 | $7,439 | $7,671 | $146,899 |
| Materials | $37,358 | $46,359 | $70,062 | $50,433 | $53,928 | $77,839 | $69,544 | $54,386 | $64,166 | $524,075 |
| Hazardous Waste Removal | $20,964 | $25,952 | $38,178 | $27,946 | $23,756 | $24,437 | $39,840 | $58,290 | $11,623 | $270,986 |
| Depreciation | $260,499 | $299,591 | $122,599 | $124,342 | $126,774 | $132,354 | $134,400 | $126,660 | $113,810 | $1,441,029 |
| Maint. P/R & Benefits | $146,421 | $68,384 | $78,680 | $56,805 | $73,304 | $75,984 | $66,819 | $46,832 | $37,077 | $650,306 |
| Admin. P/R & Benefits | $15,000 | $15,750 | $15,750 | $15,750 | $15,750 | $16,250 | $16,250 | $10,000 | $5,000 | $125,500 |
| Rent | $14,000 | $14,000 | $14,000 | $14,000 | $16,750 | $16,750 | $16,750 | $16,750 | $16,750 | $139,750 |
| Sewage | $15,410 | $33,256 | $32,202 | $31,921 | $43,150 | $38,492 | $34,754 | $30,627 | $9,918 | $269,730 |
| Interest | $127,440 | $135,109 | $131,298 | $127,440 | $125,385 | $119,093 | $112,420 | $105,234 | $100,100 | $1,083,519 |
| | $692,000 | $689,665 | $570,473 | $521,899 | $638,422 | $603,722 | $586,098 | $513,270 | $454,533 | $5,270,092 |